UNITED STATES of America,
Plaintiff,

v.

INSURANCE BOARD OF CLEVE-
LAND, Defendant.

Civ. A. No. 28042.

United States District Court
N. D. Ohio E. D.

Aug. 14, 1956.

———◆———

J. Howard McGrath, Atty. Gen., H. G. Morison, Asst. Atty. Gen., Marcus A. Hollabaugh, Sp. Asst. to Atty. Gen., Don C. Miller, U. S. Atty., Cleveland, Ohio, Robert B. Hummel, Sp. Asst. to Atty. Gen., David E. Clarke, Norman H. Seidler, Attys., Antitrust Division, Cleveland, Ohio, John R. Anderson, Atty., Antitrust Division, Delaware, Ohio, Harry E. Pickering, Atty., Antitrust Division, Cleveland, Ohio, for the Government.

Frank X. Cull, M. R. Gallagher, Hauxhurst, Inglis, Sharp & Cull, Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

Proceeding under Section 4 of Title 15 United States Code Annotated, the Government on February 27, 1951 filed its Complaint against the Insurance Board of Cleveland alleging that the Board combined and conspired with its officers, trustees and members to restrain and monopolize interstate commerce in the business of selling and writing fire insurance in Cuyahoga County, Ohio and has attempted to monopolize such trade and commerce in violation of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 2.

The Board is the sole defendant, but its officers, trustees and members are referred to in the Complaint as co-conspirators.

In substance it is the Government's claim that the conspiracy is evidenced by the operation and enforcement of the regulations of the Board which prevent its members from—

(1) representing any insurance company that appoints agents who are not members of the Board;

(2) placing or accepting brokerage or exchange business of agents of mutual fire insurance companies;

(3) placing or accepting exchange or brokerage business with non-Board agents except on a discriminatory basis;

(4) representing insurance companies that sell insurance at cut rates;

(5) representing mutual insurance companies;

(6) representing insurance companies that operate branch offices and solicit or sell insurance directly to the insured or contribute to the overhead expense of agents.

The Government's case is based entirely upon its claim that the challenged rules of the Board constitute boycotts that are illegal, and it seeks an injunction restraining the Board, its officers, trustees and members from "carrying out any provision of the regulations which are herein alleged to be illegal, and from making, becoming a party to, or carrying out any regulation of like character, effect or purpose."

In its Answer the Board does not deny the existence or enforcement of the rules against which complaint is made, but asserts that the rules are appropriate means adopted for the purpose of accomplishing proper objectives; that their operation results in no disparity of economic power or hardship among the persons affected thereby, and that competition and business enterprise are either not affected or are improved by the operation of the rules.

It is the defendant's position that if the rules be considered as boycotts, the restraints they impose are reasonable "in the light of the circumstances in which they operate" and do not violate the provisions of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note.

In its Supplemental Answer the Board raises the issue of mootness as to three of the rules under attack.

Both parties have moved for summary judgment, thereby conceding there is no genuine issue as to any material fact.

The case has been submitted on the pleadings, consisting of the Complaint and the Answer and Supplemental Answer of the defendant; a stipulation of the parties together with exhibits annexed thereto; numerous requests for admissions and the responses; affidavits of three persons submitted by defendant, and a lengthy deposition of a former President of the Insurance Board.

Voluminous briefs have been filed by both parties. The briefs contain detailed explanations of the various facets of the insurance business and extensive and elaborate arguments upon the effect of each of the challenged rules of the Board together with analyses and discussions of the many authorities cited and relied upon by both parties. Also outlined in the briefs are the various practices of the Board designed to promote and elevate the ethical and professional standards of its members and insurance agents generally; its program of sponsoring and conducting educational classes in insurance which are available to Board members and non-Board members alike; its activities in assisting the State Superintendent of Insurance in the enforcement of the relevant statutes; and its collaboration with the State Board of Fire Insurance Agents in advocating or opposing legislation affecting the insurance business.

While a full exposition of all matters treated in the briefs might serve better to illuminate the controversy, this could be accomplished only by extending this opinion beyond readable limits. Inasmuch as questions of law only are presented, it will be sufficient to state generally the salient facts about the Board, the independent agency system under which its members do business, and to outline the nature and effect of the challenged rules.

The Insurance Board of Cleveland is a non-profit corporation organized under the laws of Ohio. It was originally established as a trade organization in 1846 and undoubtedly is the oldest trade organization in Cuyahoga County. While it has undergone changes of name and corporate structure, it has functioned continuously throughout its existence as a trade association. Its membership consists exclusively of independent fire insurance agents doing business in Cuyahoga County, Ohio who represent insurance companies organized under the stock ownership plan. Its territorial jurisdiction is confined to Cuyahoga County, Ohio and at the time of filing the Complaint its rules applied only to fire and inland marine insurance. Insurance companies or their employees are ineligible for membership. The members of the Board bear all of the overhead expense of their businesses and enter into agency contracts with such insurance companies as they choose to represent. All agents who are members of the Board operate under the American Agency System and by contract with the companies they represent, obtain "expiration rights" to the policies they write. This secures to them a proprietary interest in their businesses. According to the defendant, this assures to the individual agent that degree of independence that enables him best to serve the interests of his customers and the community. It is one of the principal objects of the Board to secure for its members freedom from Insurance Company domination. The members of the Board do not represent Mutual fire insurance companies, and agents or employees of such companies are not eligible for membership in the association. At the time of the filing of the Complaint the Board had a membership of about 472 agents representing 175 stock fire insurance companies.

The position of an independent agent is unique. Insurance companies who conduct their business in any locality solely through such agents are almost entirely dependent upon the agents for the volume and quality of their business. This situation is accurately described in paragraph 18 of the Complaint, the allegations of which are admitted by the defendant:

"Par. 18. The successful business operation of a fire insurance company in any locality where the company desires to operate through agents is directly related to its opportunity to secure the representation of the most profitable and best established agencies. Control of the business resides to a great extent with the agents. The policyholder places business with the agents, and the choice of companies is generally left to the agent. Personal contact with the policyholder is confined to the agent, so that there is little a company can do to increase its business by direct appeal to the policyholder. Accordingly the company seeks representation with the agent or agents possessing the largest established clientele. Furthermore, the company delegates to the agents wide discretionary powers which may involve substantial financial risk to the company. Therefore, it is essential that the company be represented by an agent who is skillful, reliable and responsible in the selection of risks, preparation of policies and reports, and the collection of premiums and the payment of claims."

The Board occupies a dominant position in the fire insurance business in Cuyahoga County. At the time of the filing of the Complaint the members of the Board wrote more than eighty per cent. of the fire insurance business in this area. As will hereinafter more fully appear, the Board was reorganized in 1953 and its membership now includes independent agents who write casualty and surety insurance as well as coverage for fire and inland marine risks. Whether the proportion of business done by Board members in the larger field now within the Board's jurisdiction is greater or less than eighty per cent. is not shown.

The Government's attack is leveled at six of the rules of the Board. They are—

(1) the In or Out rule

(2) the Reciprocity or non-intercourse rule

(3) the Non-deviation rule

(4) the Direct Writer rule

(5) the rule that disqualifies for membership agents whose policy writing and recording expenses are borne by insurance companies, and

(6) the Mutual rule.

The provisions of each of the foregoing rules will be stated separately in connection with the discussion of the issues raised as to each.

Does the Federal Anti-Trust Act Apply?

■ Defendant contends that the rules of the Board and the activities of its members are entirely local in their operation and effect and beyond the reach of the Sherman Anti-trust Act. This claim may be disposed of with brief comment. In United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, the Supreme Court held that the insurance business was commerce and that a transaction between an insurance company organized in one State and a policyholder of another was commerce between the States and subject to regulation under the Sherman Act.

More than ninety per cent. of the insurance companies doing business in Cuyahoga County who are represented by Board members, are domiciled in States other than Ohio. The Supreme Court's opinion in South-Eastern Underwriters leaves no room for doubt that the business of these foreign corporations conducted by their local agents is interstate commerce.

For one hundred and fifty years preceding the South-Eastern Underwriters decision there was no federal regulation of insurance business. Shortly after that decision was announced Congress passed the McCarran Act, March 9, 1945, Title 15 U.S.C.A. §§ 1011 to 1014 inc., which declared that "the continued regulation and taxation by the several States of the business of insurance is in the public interest". By the terms of Section 1012, Title 15 U.S.C.A., it was provided that after June 30, 1948 the Sherman Act and other designated federal statutes regulating interstate commerce "shall be appli-

cable to the business of insurance *to the extent that such business is not regulated by State law."* (Emphasis supplied.)

Section 1013, Title 15 U.S.C.A., provides that until June 30, 1948 the Sherman Act shall not apply to the business of insurance or acts done in the conduct thereof. However, the limitations in the McCarran Act on the applicability of the Sherman Act to the business of insurance after June 30, 1948 and the suspension of the operation of the Sherman Act during the three-year period prior to that time are not unqualified or absolute. By the terms of Section 1013(b) Congress made it clear that agreements to boycott or acts of boycott affecting the insurance business remain at all times within the effective ban of the Sherman Act. Section 1013(b) provides:

"Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

The defendant argues that the prohibitions of the Sherman Act against boycotts, coercion or intimidation remained in effect only during the three-year period prior to June 30, 1948. This argument rests upon the construction of the statutory language—"Nothing contained in this chapter" as meaning "Nothing contained in this section." This is clearly erroneous. As used in Section 1013 (b) the word "chapter" is synonymous with the word "act" as used in the text of the legislation adopted by Congress. Reference to the legislative history of the McCarran Act confirms the construction that the prohibition in the Sherman Act against boycotts was to continue in effect at all times. On January 24, 1945 the Senate Committee on the Judiciary reported favorably on the bill which ultimately became the McCarran Act and among other things said:

"Section 4 (Section 3 of the final enactment) suspends the application of the Sherman Act and the Clayton Act to the business of insurance until January 1, 1948; and (b) provides that *at no time are the prohibitions in the Sherman Act against any act of boycott, coercion, or intimidation suspended. These provisions of the Sherman Act remain in full force and effect.* (Parenthetical phrase and emphasis supplied.)"

The allegations of the Complaint which charge agreements to boycott bring the issues in this case within the scope of the Sherman Act.

Are the Issues in Respect of the In-and-Out Rule, the Reciprocity Rule, and the Non-Deviation Rule Moot?

On the 15th day of April, 1953 the Board was reorganized and its rules revised. This revision resulted in the elimination of the In or Out rule, the Reciprocity Rule, and the Non-Deviation rule. In its Supplemental Answer the defendant avers *inter alia* that for several years last past it has had in contemplation the necessity of a revision of its rules to meet the changing needs of the insurance business as conducted in Cuyahoga County, Ohio by its members; that fire insurance companies organized in Ohio or admitted to do business in said State were restricted by law to the writing of policies covering fire insurance and certain specified allied lines; that during the years preceding the filing of this action and while it was pending, States other than Ohio adopted multiple line legislation broadening the powers of fire insurance companies so as to permit the writing of many other forms of insurance not theretofore permitted by State laws; that Ohio and Arizona were then the only States operating under limited powers; that during said period multiple line legislation had been proposed in several sessions of the General Assembly of Ohio and it is anticipated that Ohio will adopt such legislation at the present or succeeding sessions of the State legislature; that the adoption of such legislation would make several of the rules of the Board obsolete or impracticable of operation. The Supplemental Answer also avers that the Rules Committee of the Board had been "at work" for two years formulating and

drafting a revision of the Board's rules so as to adapt them to the changing needs of the insurance business, and that the revision of the rules was approved by the membership of the Board on April 15, 1953. At the time of the revision of the rules the Board was reorganized and its jurisdiction enlarged to include casualty and surety insurance in addition to fire and inland marine.

The defendant avers that neither the Board nor its members intend now or at any time in the future to reenact or enforce the In or Out rule, the Reciprocity rule, or the Non-Deviation rule, and that the enforcement of said rules is now impossible and that there is no reasonable expectancy that said rules will be reenacted or enforced in the future.

These averments of the Supplemental Answer, supported as they are by the sworn testimony of a former President of the Board, raise the issue of mootness as to the three rules eliminated by the revision of April 15, 1953.

■■ It is settled that the voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere volition of a party the challenged practices may be resumed. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754; Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29; N. L. R. B. v. Local 74, etc., 6 Cir., 181 F.2d 126, at page 133. As stated in United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978:

"It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." 343 U.S. at page 333, 72 S.Ct. at page 696.

A defendant's promise not to repeat the wrong is not sufficient to warrant a conclusion of mootness. N. L. R. B. v. General Motors Corp., 2 Cir., 179 F.2d 221.

■ Nor can issues be considered as moot where there is a dispute as to the legality of the challenged practices and the defendant is free to return to his old ways, or where there is a public interest in having the legality of the practices settled. Walling v. Helmerich & Payne, supra; Local 74, United Brotherhood of Carpenters & Joiners of America, A. F. of L. v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309; United States v. W. T. Grant Co., 345 U.S. 629, at page 632, 73 S.Ct. 894, 97 L.Ed. 1303.

■ But the cases also hold that where by reason of events occurring either before or after the commencement of suit it is no longer possible for the defendant to engage in the alleged offensive practices, or where a voluntary discontinuance of such practices is accompanied by a *bona fide* promise not to resume them and it clearly appears that there is no reasonable expectancy of their resumption, a conclusion of mootness is warranted.

In United States v. Hamburg-Amerikanische, etc., Co., 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387, the issue involving alleged illegal agreements among steamship lines was held to be moot because of impossibility of performance as a result of World War I, which commenced more than three years after the action was filed. To the same effect is United States v. American-Asiatic Steamship Co., 242 U.S. 537, 37 S.Ct. 233, 61 L.Ed. 479. See also Berry v. Davis, 242 U.S. 468, 37 S.Ct. 208, 61 L.Ed. 441. In United States v. United States Steel Corporation, 251 U.S. 417, at pages 444–445, 40 S.Ct. 293, at page 297, 64 L.Ed. 343, it was held that certain issues were moot where the alleged illegal practices were abandoned nine months before suit was commenced "from a conviction of their futility" and there was no intention to resume them or any dangerous probability of their resumption.

In Commercial Cable Co. v. Burleson, 250 U.S. 360, 39 S.Ct. 512, 513, 63 L.Ed.

1030, a determination of mootness was made where there was an apparent voluntary abandonment of the wrong complained of while the case was pending on appeal in the Supreme Court. In that case the United States Postmaster General took possession and assumed control of the cable lines owned by the plaintiffs. Actions to enjoin the Postmaster General from interfering with plaintiffs' property were dismissed by the District Court. The cases were argued on appeal in the Supreme Court and while there under consideration, counsel directed the court's attention to the fact that the properties had been returned to appellant by the Government as well as all revenues derived therefrom during the period of Government operation and control. Appellants contended that notwithstanding such action they were entitled to a decree on the ground that in the absence of injunctive relief there was reason to fear a repetition of the wrongful conduct. The Supreme Court, speaking through White, Chief Justice, rejected the argument, saying:

"We are of the opinion that these anticipations of possible danger afford no basis for the suggestion that the cases now present any possible subject for judicial action, and hence it results that they are wholly moot and must be dismissed for that reason."

In St andard Oil Co. of Indiana v. United States, 283 U.S. 163, 181, 51 S.Ct. 421, 75 L.Ed. 926, it was held that issues became moot where alleged invalid provisions of a license agreement and other provisions in a contract were cancelled during the trial of the action at the suggestion of the District Judge.

In United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, the defendants were unable to satisfy the court that they were not free to resume the challenged practices, and the court held against their claim of mootness. However, the court recognized that a case can become moot if it appears improbable that the defendant will repeat the alleged wrong. In this connection the court said, 345 U.S. at page 633, 73 S.Ct. at page 897:

"The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'"

It is the teaching of the Supreme Court cases cited above that where during the pendency of an action for injunctive relief the defendant has discontinued the alleged illegal practices and in good faith promises not to resume them and it is made clearly to appear that there is no reasonable expectancy of their resumption a conclusion of mootness is warranted.

Whether the issues relating to the rules referred to in the Supplemental Answer are moot must be determined by ascertaining whether defendant's abandonment of the rules after this action was commenced reflects a *bona fide* intention not to reenact them, and whether there is no dangerous probability that the restraints imposed thereby will be revived.

Before examining the evidence relevant to these questions it should be noted that the defendant does not concede the illegality of the three rules. On the contrary, defendant stoutly and vigorously contends that all of them are reasonable and not in violation of the Sherman Act. The issue of mootness will be considered separately as to each of the above rules.

### The In or Out Rule.

This rule declares ineligible to membership those who are agents of or transact business with fire insurance companies or any one of a group of companies under the same underwriting management or control which " * * * in transacting such insurance business in Cuyahoga County does not have an agent who is a member of this corporation or has or appoints an agent who is not a member of this corporation."

Under the In or Out Rule Board members are required to confine their representation of fire insurance companies to those companies who transact all their business in Cuyahoga County through

members of the Board. The effect of the rule is to require a fire insurance company doing business in Cuyahoga County to elect whether to be represented by Board members exclusively or to deal solely through non-Board agents. If an insurance company desires to be represented by members of the Board, it must refrain from appointing any non-Board agents. The appointment of a single non-Board agent results in the denial of a company's right to deal through any agent who is a Board member. Similarly, an agent who represents a single non-Board company is ineligible for membership in the Board and is denied the right to represent any of the companies who deal exclusively through Board members. If an agent or company elects to conform to the rule, a subsequent deviation therefrom would have far-reaching consequences entailing the loss by companies of the representation of successful agents who are members of the Board, and the loss by Board members of the representation of large and financially sound insurance companies.

Defendant does not deny that the In or Out Rule imposes restraints on freedom of business judgment, but defends the rule as beneficial to both members of the Board and the public. The Board considers this rule "to be the keystone of the Board's structure and the sole means by which it maintains the organizational strength to carry out the Board's beneficial purposes set forth in its Articles of Incorporation."

The foregoing is a sufficient outline of the nature and effect of the rule as background for a consideration of the question whether the issue of its alleged illegality has become moot.

Prior to the reorganization of the Board in April, 1953 the In or Out Rule applied only to the business of fire and inland marine insurance and, as indicated above, by its reorganization the Board's jurisdiction was broadened to include casualty and surety insurance. However, during the period prior to April, 1953 members of the Board engaged in the sale of casualty, automobile, and surety insurance in addition to fire and inland marine. Thus, during the period prior to reorganization the members of the Board were subject to its rules in respect of one class of insurance coverage but entirely unaffected by those rules in the writing of other types of insurance. The record discloses that for many years, and particularly during the past twenty-five years, there has been an enormous increase in the amount of casualty insurance and that in some agencies within the Board their casualty business was greater than the amount of business done by them in fire insurance. This, of course, resulted in many Board members representing casualty insurance companies that had other agents who were not members of the Board. In view of this it was apparent that if multiple line legislation were enacted in Ohio and fire insurance companies authorized to write policies of casualty and fire insurance, and casualty companies permitted to write policies covering similar combined risks, the In or Out Rule could no longer be limited to fire insurance without causing substantial losses to members of the Board. In the event of the enactment of multiple line legislation the continuance in effect of the rule as to fire insurance only would result in serious loss to Board agents with established connections with non-Board casualty companies. In such event the agents could write casualty insurance policies only for non-Board companies. They could not write combined policies of casualty and fire insurance for such companies. In these circumstances it was hardly to be expected that casualty companies would continue to do business with members of the Board who were precluded by the In or Out Rule from writing fire insurance coverage in combination with policies of casualty insurance. The extension of the In or Out Rule to include casualty and surety insurance also presented great difficulties. For many years casualty and surety companies had been represented by both Board and non-Board agents. Many of these companies could not relinquish long-established and profitable connections with non-Board agents

and do business exclusively through members of the Board without sustaining a substantial loss of business. Likewise many Board agents would suffer substantial financial loss if required to sever their relations with non-Board casualty companies. It was therefore considered by the Board that the changed conditions of the insurance business and the further changes forecast by the prospect of the enactment of multiple line legislation made the enforcement of the In or Out Rule impracticable if not impossible, and for these reasons the rule was abandoned. The adoption of multiple line legislation in Ohio which was foreshadowed at the time of the reorganization of the Board, occurred at the January, 1955 session of the Ohio General Assembly. Under the statutes now in effect fire insurance companies may write policies on all principal risks except life, ocean marine, and specialized title insurance. The powers granted to casualty companies are equally broad. According to the testimony of a former President of the Board, ninety-five per cent. of the Board members now represent non-Board companies. Therefore a return to the In or Out Rule would render a substantial majority of the Board ineligible for membership and would result in the extinction of the Board. Thus, all that could be accomplished by injunctive relief has been acheived by the abandonment of the In or Out Rule.

Nor does it appear that the reorganization of the Board and the revision of its rules were influenced or hastened by the commencement of this action. For many years prior thereto agency groups had discussed the probable need of revising the Board's rules in view of the changing character of the insurance business. In 1947 consideration was given to the specific terms of revision necessary to include casualty insurance within the jurisdiction of the Board. The reorganization of the Board was under consideration before the Government commenced its investigation preliminary to the filing of this action, and the practical problems of adapting casualty and surety business to the rules applicable to fire insurance were such as required careful and mature consideration. The revision of the rules was considered by appropriate committees of the Board for a period of about two years before the new rules were adopted by the membership.

There can be no doubt that defendant's professed intention not to reenact this rule is made in good faith, and the improbability of its revival is assured by reason of the disastrous consequences to the Board that would result from such action. I hold that the issue of the legality of the In or Out Rule is moot.

### The Reciprocity Rule.

The Reciprocity or Non-Intercourse Rule prohibits any member of the Board from transacting fire and inland marine insurance business with any one having an office connection, physical or financial, with an agent who is not a member of the Board, except as to surplus business. Surplus business is defined as follows:

"The term 'surplus business' is defined as insurance which is in excess of the amount which a member is able to obtain from insurers which he represents, and from insurers which other members represent; or insurance which is in excess of the amount which a non-member resident agent is able to obtain from insurers operating on the stock plan which he represents and from similar insurers which other non-member resident agents represent."

This rule makes provision for the placing of surplus business by a Board member with agents who are not members of the Board and for the acceptance by Board members of surplus business from non-Board agents upon compliance with the procedure specified in the regulations.

The interchange of such business is effected through applications made to the Secretary of the Board. The procedure requires that Board members first exhaust all efforts to place surplus business with other members of the Board and then certify to the Secretary their inability to place such business within the

Board. Likewise, non-Board members, as a prerequisite to placing surplus business with Board members, must certify that they have exhausted all efforts to place such surplus business with agents outside the Board. This rule is limited to agents representing insurance companies operating on the stock-ownership plan and has no application to mutual companies or their agents.

It is unnecessary to comment upon the arguments against and in support of the legality of this rule. With the elimination of the In or Out Rule there is no restriction against Board members representing stock insurance companies who also deal with non-Board agents. Nor are insurance companies now required to elect to deal exclusively through either Board or non-Board members. The capacity of all stock insurance companies in Cuyahoga County is now available to all agents representing such companies, and there is no longer any reason for the existence of the Reciprocity Rule. It must be held, therefore, that the issue raised as to this rule is moot. Defendant's good faith in promising not to reenact this rule is unquestioned and the futility of reviving it is ample assurance of the improbability that the Reciprocity Rule will again become a regulation of the Board.

### The Non-Deviation Rule.

The Non-Deviation Rule provides as follows:

"Membership may not be granted to, or held by, agents of insurers which deviate from rates established by an authority empowered to determine rates for insurance risks in Ohio, unless such deviations are legal and, in the opinion of two-thirds of the entire Board of Trustees of this corporation, are not detrimental to the interests of the public."

In Ohio, rates on insurance are regulated by statute to the end that they shall not be "excessive, inadequate or unfairly discriminatory." There are two methods by which rates are determined: (1) insurance companies who are members of the Ohio Inspection Bureau furnish complete statistical data on their loss and expense experience, and similar data from companies throughout the country is also furnished to the Bureau by the National Board of Fire Underwriters. Rate schedules based upon a careful and thorough study of this comprehensive data are then filed with the Superintendent of Insurance and, if approved by him, become legally authorized rates. (2) The statute also permits an insurance company, whether a member of the Ohio Inspection Bureau or not, to file schedules based upon its own loss and expense experience. If such rates are approved by the Superintendent, they also become legal rates. The rates based upon the limited experience of one company are usually substantially less than the rates based upon the broad statistical basis upon which the Ohio Inspection Bureau rates are fixed.

The Board's Non-Deviation Rule is directed principally against cut rate companies that file ratings constituting percentage reductions of the Bureau rates. According to the Board, its opposition to deviations is in the public interest and is based upon the history of cut-rate competition in the insurance business with its record of impairment of the financial integrity of companies whose policies were sold on that basis. The position of the defendant is summarized in its brief as follows:

"From the foregoing recitation, two cardinal principles appear to be clear: (1) it has been recognized by both Congress and the State legislatures of the several States that in the insurance business concerted action—not cut-rate competition—is necessary in the development of a fair and equitable rate structure to assure the solvency of companies and the reasonableness of premiums, and (2) that premium rates can only be determined with validity if there is a wide statistical base upon which to calculate them. Actuarial credibility is the *sine qua non* of proper rating practice."

The Government argues that the Non-Deviation Rule is a boycott designed as a means of fixing prices and is in direct violation of the Supreme Court's holding in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221–222, 60 S.Ct. 811, 843, 84 L.Ed. 1129, where it was said:

"Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike. * * * Any combination which tampers with price structures is engaged in an unlawful activity."

The defendant counters this argument by asserting that the above principles have application to price fixing in the open market where prices are determined by the free play of market forces, but are not relevant here where the establishment of rates in the insurance business involves a State-controlled system of establishing rates.

The foregoing sufficiently illustrates the issue raised by the attack on the Non-Deviation Rule of the Board. In support of its claim that this issue is now moot, the defendant asserts that the rule has been abandoned because it would be impracticable to enforce it under the enlarged jurisdiction of the Board. Defendant relies upon the testimony of a former President of the Board to the effect that statutes relating to fire and casualty insurance rates generally do not establish a mean or norm in rating schedules to which the Non-Deviation Rule "could have been directed in many classifications of business."

█ While the impracticability of reviving the Non-Deviation Rule as to one or more of the classes of insurance within the Board's enlarged jurisdiction is not entirely clear, it seems unlikely that the Board will reenact this rule either in whole or in part. The advent of the multiple line legislation and the abandonment of the In or Out Rule have created a situation that would make the enforcement of even a limited non-deviation rule extremely difficult. While I am unable to find that there is no reasonable expectation that this rule will be revived in a limited form, it does appear that defendant's disclaimer of intention to reenact the rule is made in good faith, and under the circumstances as disclosed by the record the mere possibility of a limited revival of the rule is not sufficient to warrant injunctive relief. In United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, the Supreme Court upheld the action of the District Court in refusing to grant injunctive relief against a possible recurrence of the violation of the Sherman Act there involved, although the court also held that the issue raised was not rendered moot because of the voluntary discontinuance, after suit commenced, of the illegal conduct, and the defendant's disclaimer of any intention to revive the offensive practices. The Grant case is clear authority for the denial of injunctive relief on this issue. The dismissal of the claim of the Government as to the illegality of the Non-Deviation Rule will be without prejudice to a new action if the rule is revived in the future.

There remains for determination on the merits the issues relating to the legality of the Mutual Rule, the Direct Writer Rule, and the Rule prohibiting a member of the Board from utilizing the services of a company branch office providing policy-writing and recording facilities.

It is the Government's contention that each of these rules constitutes an agreement to boycott and as such is illegal *per se*. The defendant concedes that in effect the rules are concerted refusals to deal, but contends that the rule of reason must be applied to determine whether they impose unreasonable restraints of trade in interstate commerce.

In support of its claim that all boycotts are illegal *per se* the Government relies chiefly upon dicta of the Supreme Court in United States v. Columbia Steel Co., 334 U.S. 495, 522, 523, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533, and Times-Picayune Pub. Co. v. United States, 345 U.S. 594,

73 S.Ct. 872, 97 L.Ed. 1277. In Columbia Steel the court said:

> "A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal *per se*. For example, where a complaint charges that the defendants have engaged in price fixing, *or have concertedly refused to deal with non-members of an association*, or have licensed a patented device on condition that unpatented materials be employed in conjunction with the patented device, then the amount of commerce involved is immaterial because such restraints are illegal *per se*." (Emphasis supplied.)

Cited in a footnote in support of the italicized portion of the quoted language are: Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; Eastern States Retail Lumber Dealers Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; Fashion Originators Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; and Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608.

In Times-Picayune it was stated [345 U.S. 594, 73 S.Ct. 889]:

> "Though group boycotts, or concerted refusals to deal, clearly run afoul of § 1 [of the Sherman Act], Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219; Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; see United States v. Columbia Steel Co., 1948, 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533, different criteria have long applied to qualify the rights of an individual seller."

However, in neither Columbia Steel nor in Times-Picayune was there an issue of group refusal to deal. While the dicta of the Supreme Court in those cases are entitled to the greatest respect, they are not binding precedents. The admonition of the Supreme Court itself is that dicta ought not to control judgment in future cases. In Wright v. United States, 302 U.S. 583, at pages 593–594, 58 S.Ct. 395, at page 399, 82 L.Ed. 439, the court said:

> "The oft-repeated admonition of Chief Justice Marshall, 'that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used,' and that if they go 'beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision,' has special force in this instance. Cohens v. [Commonwealth of] Virginia, 6 Wheat. 264, 399, 5 L.Ed. 257."

In Darr v. Burford, 339 U.S. 200, at page 214, 70 S.Ct. 587, at page 595, 94 L.Ed. 761, the court pointedly noted the doubtful value of dicta as follows:

> "We doubt the effectiveness of a voluntary statement on a point not in issue."

The court then illustrated the embarrassing potentialities of "general expressions" by quoting in note No. 38 the picturesque language of Bowen, L. J., in Cooke v. New River Co., 38 Ch.D. 56, 70–71, as follows:

> " ' * * * like my Brothers who sit with me, I am extremely reluctant to decide anything except what is necessary for the special case, because I believe by long experience that judgments come with far more weight and gravity when they come upon points which the Judges are bound to decide, and I believe that *obiter dicta*, like the proverbial chickens of destiny, come home to roost sooner or later in a very uncomfortable way to the Judges who have uttered them, and are a great source of embarrassment in future cases.' "

An examination of the cases cited in support of the *dicta* in Columbia Steel and Times-Picayune reveals that in all of

them the vice of illegality was inherent in the unlawful objectives of the combination and in the means employed to accomplish their purposes. In Kiefer-Stewart there was evidence sufficient to support a finding of a conspiracy to fix maximum prices. In Montague there was an incipient monopoly that effectively excluded the complaining dealer from the market, and, as the court found, it was a part of the scheme to enhance the price of tiles. Among the many factors that condemned the boycott in Fashion Originators' Guild [312 U.S. 457, 61 S.Ct. 708], was the aim of the combination to destroy "one type of manufacture and sale which competed with Guild members." In Eastern States Lumber there was a blacklisting of wholesalers who sold directly to the consuming public in competition with retailers which the court found was an unreasonable restraint of trade. In Associated Press the arbitrary and oppressive membership by-law which was struck down was designed to suppress and stifle competition. Present in all the cited cases was the common evil of coercive action against parties outside the group. Considered in the light of the cases upon which it rests, the *dicta* of the court may be considered fairly as asserting no more than that group refusals to deal of the kind exemplified by the cited cases and which exert coercion on outside parties are illegal *per se*.

■ The construction for which the Government contends holds the *dicta* to be an unqualified condemnation of all group refusals to deal, irrespective of their intent and effect and the means employed to accomplish the purposes of the combination. Within the all-embracing compass of this construction a group refusal to deal motivated by legitimate business reasons, exerting no coercion upon outsiders and resulting in no unreasonable restraint of trade, would nevertheless be a violation of the antitrust act. The Government's contention goes too far. Under its interpretation many innocent practices of trade associations which only indirectly affect outsiders and

which create no unreasonable restraint of trade would be brought within the ban of the Act and the alleged offenders denied the opportunity to justify their conduct. Such a construction is squarely in conflict with the Rule of Reason. That the Supreme Court still regards this Rule as the cardinal tenet of antitrust doctrine is demonstrated by its unequivocal statement in the recent case of United States v. E. I. DuPont de Nemours Co., 351 U.S. 377, 387, 76 S.Ct. 994, 1002, that "This Court has not receded from its position on the Rule." By remarkable coincidence, this statement is documented by reference in note No. 9 to United States v. Columbia Steel Co. and Times-Picayune Pub. Co. v. United States, supra, which are the very cases in which the *dicta* here under discussion appear. In none of the cited cases was the decision of the Supreme Court based upon the application of the principle that all boycotts are illegal *per se*. Having forborne the declaration of such a principle in cases where group refusals to deal were directly in issue, it is unreasonable to suppose that the court intended to announce such a principle in cases where the issue was not presented. If the *dicta* are to be regarded as a prophecy of the court's adoption of the doctrine of *per se* illegality in future boycott cases, it seems reasonable to predict that its application will be limited to cases where a combination seeks by coercion, intimidation, or threats to compel outsiders to do or refrain from doing that which the group approves or condemns, and where the purpose or necessary effect of the combination is to unduly restrain or monopolize interstate commerce. I am of the opinion that the Rule of Reason as laid down in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, and followed in Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232, and many other cases, must be applied to determine whether the rules of the Board here under attack are illegal.

## The Direct Writer Rule.

The Direct Writer Rule declares ineligible for membership agents who transact business for an insurance company or one of a group of insurance companies under the same management or control which—

> solicits such insurance in Cuyahoga County from the assured either directly or through any of its employees except in conjunction with an agent of such insurer who is a member of this Corporation.

The Rule excludes from membership in the Board agents who represent insurance companies that sell through branch offices in Cuyahoga County, and a member of the Board who violates the rule is subject to expulsion. In effect, this rule is also an agreement among the members of the Board to refuse to deal with insurance companies who sell insurance directly to policyholders. While in terms the rule proscribes representation of all insurance companies that sell directly to policyholders, in practical effect it is limited to those companies which sell through Board members and which also engage in direct solicitation of the public. At the present time in Cuyahoga County there are but a small number of insurance companies that sell directly to the public through branch offices, and none of them are represented by independent agents. A former President of the Board testified that he knows of no direct-writing company that also sells through independent agents. It is obvious that an insurance company which deals with the public exclusively through its own agents or employees cannot be affected by the concerted action of independent agents with whom it does not have or intend to have any business relations. However, while the rule is in effect, insurance companies represented by Board agents cannot establish branch offices for the sale of insurance in Cuyahoga County without suffering the loss of business obtained through such agents, as well as being denied the right to obtain business through other Board members.

The defendant urges that the rule is justified as necessary to protect agents against insurance company domination and is of benefit to the public in that an independent agent is in a position at all times to act effectively in the interest of the assured. It is undoubtedly true that independent agents operating under the American Agency System enjoy a degree of independence not possessed by insurance company agents or employees. An independent agent usually represents two or more insurance companies, and, by virtue of agreements with them or by custom, owns and controls the expiration rights of the policies he writes. An independent agent may place the business with any of the companies he represents. An insured who deals with such an agent seldom knows the name of the insurance company issuing the policy and relies upon the agent to provide the proper coverage and to select the company with whom the business is placed. The insured is regarded as the client or customer of the agent and as between the company and the agent, the latter controls the business. An independent agent is therefore in a position to represent effectively the interests of the insured, especially at those times when a loss occurs and a conflict arises between the insurance company and the policyholder. The Direct Writer Rule is designed primarily to protect and safeguard the agent's interest in the expiration records. This is made clear by the defendant's argument that—

> "These records give the agent control over the business which he has produced by his own industry. These records are equally available to the respective companies in which the policies were written, and if such company were to open a branch office in Cuyahoga County in competition with the agent who has produced the business, it would do so unfairly advantaged with such records, and such competition would be completely destructive of the agent's business."

Copies of expiration records are in the possession of the insurance companies, but there is no evidence tending to show an intention on their part to deprive the agents of their renewal rights. Concededly, it would be difficult for a foreign insurance company, having few, if any, employees in Cuyahoga County, Ohio, to infringe upon the expiration rights of their local agents. An insurance company that establishes a local branch office in direct competition with its agents undoubtedly would be in an advantageous position to engage in piracy of those rights, but, in the absence of evidence indicating such a purpose, it cannot be presumed they would do so. The presumption is the other way. Defendant's apprehensions in this regard constitute no justification for a boycott of companies who sell insurance directly to policyholders.

It is but natural that agents should be solicitous to preserve their expiration rights. It is vital to the agent's status of independence and to his survival as the proprietor of his own business that he maintain ownership and control of the expiration records which, for all practical purposes, constitute his only asset of real value. An independent agent has the unquestioned right to cease doing business with an insurance company for any reason he deems sufficient and may do so merely because he suspects that a company by the establishment of a branch office intends to engage in piracy of his renewal rights. But when an agent goes beyond his personal right and combines with others of like purpose in a concerted refusal to deal with insurance companies "such action brings him and those acting with him within the condemnation" of the Sherman Act. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 614, 34 S.Ct. 951, 955, 58 L.Ed. 1490.

As justification for the boycott in Grenada Lumber Co. v. State of Mississippi, 217 U.S. 433, 30 S.Ct. 535, 538, 54 L.Ed. 826, it was argued that the retailers could not maintain themselves as independent dealers if the wholesalers were not prevented from competing with them for the business of the consumer. In rejecting this argument the Supreme Court said:

"For the purpose of suppressing this competition, they have not stopped with an individual obligation to refrain from dealing with one who sells within his own circle, and thereby deprives him of a possible customer, but have agreed not to deal with anyone who makes sales to consumers, which sales might have been made by any one of the seventy-seven independent members of the association. Thus they have stripped themselves of all freedom of contract in order to compel those against whom they have combined to elect between their combined trade and that of consumers. That such an agreement is one in restraint of trade is undeniable, *whatever the motive or necessity which has induced the compact.*" (Emphasis supplied.)

The same argument was advanced by the defendant in Eastern States Lumber and was for the same reason rejected by the court. In both Grenada and Eastern States Lumber the court announced the following principle:

"An act harmless when done by one may become a public wrong when done by many, acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished, *if the result be hurtful to the public, or to the individual against whom the concerted action is directed.*" (Emphasis supplied.)

While the facts in Grenada and Eastern States Lumber differ in some respects from the facts relevant to the Direct Writer Rule in this case, the analogy is close enough to compel the application of the principle announced in the cited cases to a determination of the issue here presented.

■ Defendant argues that the Direct Writer Rule occasions no hardship to the public. This may well be true. The

rule does not involve price-fixing. Nor does it tend to diminish the available supply of insurance. And, as suggested above, the independence of the agents which the rule is designed to preserve may be of benefit to the insurance-buying members of the public. However, it is not essential to show price-fixing or a reduction in supply in order to establish the illegality of the rule. If the purpose and effect of the rule are to unreasonably restrain competition, it is within the ban of the Sherman Act. In Fashion Originators' Guild of America v. Federal Trade Commission, 2 Cir., 114 F.2d 80, 85, the court said:

"Price fixing is not, however, the only means unlawful per se; the interest of the consumer is not all that determines the 'reasonableness' of a contract 'in restraint of trade.' It is also unlawful to exclude from the market any of those who supply it—assuming that there is no independent reason by virtue of their conduct to justify their exclusion— and it is no excuse for doing so that their exclusion will result in benefits to consumers, or to the producers who remain."

See also Fashion Originators' Guild of America v. Federal Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949.

As noted above, the Board occupies a dominant position in the local market. In 1948 its members collected more than eighty per cent. of the premiums on fire and inland marine insurance policies written in Cuyahoga County. While no evidence has been offered to indicate the proportion of business done by the members of the Board, in all the classes of insurance now within the Board's jurisdiction, it has not been suggested that the Board's position in the industry is less powerful than it was. The Board recognizes as legitimate competitors direct-writing companies which deal exclusively through their own agents or employees. It cannot do otherwise. The Board can exert no economic pressure on such companies. But the contrary is true with respect to companies that deal through Board members. These companies are and for years have been the beneficiaries of a large volume of business done by members of the Board and they are vulnerable to the threat implicit in the rule. As far as the record shows, they have always respected the rights of independent agents to control their businesses: yet the Board refuses to consider these companies as legitimate competitors and seeks to prevent them from doing what other direct-writing companies may do freely. It is true that the effect of the rule is not to exclude such companies from the market. If these companies establish branch offices and sell directly, they may also deal through independent agents who are not members of the Board and who, apparently, do not share the Board's apprehensions in respect of the possible pirating of expiration rights by direct-writing companies. But this is no answer to the charge that the rule restrains competition in interstate commerce. By contract or by custom, insurance companies are bound to refrain from competing with their independent agents for the renewals of policies written for the companies by such agents. But the companies are not thereby precluded from competing with other independent agents and other direct-writing companies for renewal business or for new business. Except as they are bound to observe the renewal rights of their independent agents, insurance companies have the right to compete in all other respects for the sale of insurance in the local market. The Direct Writer Rule is designed to prevent the companies against whom it is directed from engaging in such competition. With the exception noted, these companies no less than other direct-writing companies must be regarded as legitimate competitors of Board members. It is in their capacity as independent businessmen and for the purpose of protecting their interest as such that the members of the Board have combined in a boycott against such companies. Such a boycott is illegal. As said by the Supreme Court

in Associated Press v. United States, 326 U.S. 1, 15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013:

> "The Sherman Act was specifically intended to prohibit independent businesses from becoming 'associates' in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete."

Nor is it material that the evidence does not show that the operation of the rule has actually prevented an insurance company from establishing a branch office in Cuyahoga County. It is settled that without regard to its past effects an agreement to follow a course of conduct which will necessarily restrain a part of the trade or commerce, may constitute a violation of the Sherman Act. Associated Press v. United States, supra, 326 U.S. at page 12, 65 S.Ct. at page 1420.

The defendant has not sustained the burden of justification. The Direct Writer Rule is a group refusal to deal which relies upon coercion to effectuate its purpose and, under the authorities cited above, it must be held to impose an unreasonable restraint of competition in interstate commerce.

The Government's motion for summary judgment as to the Direct Writer Rule is granted.

The Rule Prohibiting, Agents from Accepting Policy-Writing or -Recording Services from Insurance Companies.

Prior to the reorganization of the Board, this rule declared ineligible for membership agents who represented branch office companies which contributed to the agents a portion of their overhead expense. The purpose and effect of this rule was to require all members of the Board to bear the expense of policy-writing and -recording services themselves or to obtain such services on a fee basis from other members of the Board. It was designed to prevent insurance companies from establishing branch offices in Cuyahoga County for the purpose of furnishing these services gratis to Board members.

Like the Direct Writer Rule, this rule is grounded in the Board's apprehension that agents receiving policy-writing and -recording services would inevitably come under the domination of insurance companies and that the companies would be afforded an unfair opportunity to infringe upon the expiration rights of the agents. Here again the Board's apprehensions rest upon assumptions not supported by evidence. In effect, the rule also constituted a concerted refusal to deal with insurance companies who contributed to the overhead expense of agents. Since the reorganization of the Board the objectionable aspects of the rule have been removed. There is now no prohibition against Class II or Class III members accepting financial aid from insurance companies. Nor are Class I members who represent insurance companies which furnish such services disqualified from membership in the Board. Class I members include agents who have been such for more than five years and who devote their full time to the insurance business. Class II members include agents who do not engage in the insurance business on a full-time basis. Class III members consist largely of solicitors. It appears unlikely that Class I members will need or seek financial assistance from insurance companies in operating their offices. But it is not improbable that some Class II and Class III members would seek and welcome such assistance. If so, there is no provision in the revised rule against obtaining it. However, it does not appear that at the present time there is any branch office insurance company in Cuyahoga County which furnishes policy-writing or -recording services to agents. Thus, while the rule has been revised, there has been no practical change in the situation of either agents or companies. This may be due, in part at least, to the 1937 agreement between several insurance companies and the Board by the terms of which the companies agreed to discontinue operating branch offices rendering policy-

writing and -recording services to agents. There is no evidence tending to show whether it is likely that companies will again establish branch offices solely for such purposes. Nor, in the present state of the record, is it clear what effect, if any, the rule, considered independently of the Direct Writer Rule, has upon competition. In view of this, the motions of both plaintiff and defendant will be overruled, and jurisdiction retained as to this issue for its determination on the merits.

### The Mutual Rule.

The issue raised as to this rule is unique. Diligent research by both counsel and the court has failed to disclose any analogous factual pattern or similar issue in the reported cases. The rule limits membership in the Board to agents who represent stock insurance companies exclusively. Representation of a mutual company disqualifies an agent for membership in the Board. A corollary rule prohibits interchange of excess insurance business between members of the Board and mutual companies or agents. The rule constitutes an agreement among the members of the Board to refrain from representing any mutual insurance company.

Since its organization more than a century ago, the Board has been dedicated to the policy of representation of stock insurance companies. Its present amended Articles of Incorporation re-affirm its historic purpose to preserve the American agency system and to foster and preserve the capital stock principle in the insurance business. Before the Board was reorganized in 1953 and while its jurisdiction was limited to fire and inland marine insurance, its members represented stock insurance companies exclusively. Since its reorganization and the enlargement of its jurisdiction to include casualty and surety business, the Board has adhered to this same policy of exclusive representation of insurance companies organized on the stock ownership plan. This policy of the Board is dictated by considerations flowing from the basic difference between stock and mutual insurance companies and the dif-

ference in the relationship of the policyholders of each to their insurers, and to the belief of the members of the Board that representation of mutual companies would be inimical to the American agency system under which they acquire renewal rights in the policies they write. That the two classes of insurance are fundamentally different is a matter of general knowledge. A stock company has for its basis capital stock owned by its shareholders, who constitute the corporation and may be distinct from its policyholders. Its divisible profits are distributed in the form of dividends to its shareholders. In strictly mutual companies there are no stockholders; the policyholders are members of the corporation, entitled to manage its affairs through their agents and officers and to receive by way of dividends or premium allowances a share of the divisible surplus. In most cases, but not always, mutual insurance costs less. As an owner of a company in which he is insured, a mutual policyholder is subject to contingent liability if the policy so provides, and, in some instances, contingent liability attaches even though the policy is designated as non-assessable. Under the laws of the various States, mutual companies whose surpluses are above the prescribed minimum may issue non-assessable policies. However, if by virtue of substantial losses not reflected in its stated surplus at the time a policy is issued, the actual surplus of a company is less than the statutory minimum, the holder of a mutual policy described as non-assessable may nevertheless be subject to contingent liability. That this is not a matter of frequent occurrence is indicated by the statement of a former President of the defendant Board who said he knew of no such case. Aside from the risks of contingent liability and the Board's adherence to the principle of the profit system as opposed to what it considers a socialized form of insurance, its preference for stock insurance is based upon considerations of self-interest. Either by contract or by custom, stock insurance companies recognize that expiration rights belong to the inde-

pendent agents. Generally speaking, this is not true with respect to mutual companies. The evidence is not clear as to whether any mutual insurance company respects the right of independent agents to the ownership of expiration rights. In answer to the question whether "there were some mutual companies which respect the rights of the producing agent as respects renewals," the witness Frazier answered in part: "If so, they are very limited in number." However, in its brief the Board concedes that there may be a few mutual companies which by contract recognize an independent agent's rights to renewals. However, mutual companies are not bound by custom, as stock insurance companies are, to respect renewal rights of independent agents. The contrasting position of the two classes of companies in this regard is highlighted by the recent case of Hedlund v. Farmers Mutual Automobile Ins. Co., D.C., 139 F. Supp. 535, 537. In that case a former agent brought suit against a mutual company to recover damages for alleged malicious interference with his rights to renewals of policies written by the company. In denying the plaintiff relief, the court delineated the distinction between the rights of an agent for a stock insurance company and the rights of a mutual agent as follows:

"But the property rights which are protected by the courts in these cases are ones which originate under stock insurance company dealings with its agents—or something similar to it—especially in the fire insurance field. Under such circumstances the insurance company has no direct contact with the insured; the policy is issued by the agent and countersigned by him; the agent has the power to cancel or amend the policy; he collects the premiums and makes remittance on his own to the company; he may switch companies upon the expiration of the policy or he may cancel it during its term and place the risk in another company. Under such a relationship the agent is an independent contractor and possesses a property right in the expirations which he may sell or which may be the subject of disposition upon death.

"The evidence here shows that the contractual relationship between the plaintiff and defendant falls into a different category. The defendant is a mutual insurance company. It is owned by its policy holders. The agent occupies a different position than he does in the traditional stock insurance company-agent relationship. The policy is issued directly by the insurance company and not by the agent. The agent has no authority to cancel it; he usually does not collect the premiums; the policy is written on a continuous basis, and each 6 months the company bills the insured directly for future premium, and, upon payment, sends a 'continuation certificate' directly to the insured. Upon payment of the renewal premium, the agent receives a renewal commission of from 8 to 10 per cent from the company."

The rights of agents of stock insurance companies under similar circumstances have been recognized by the courts. In re Chapman, D.C., 50 F.2d 252; Northwest Underwriters v. Hamilton, 8 Cir., 151 F.2d 389; Kerr & Elliott v. Green Mountain Mut. Fire Ins. Co., 111 Vt. 502, 18 A.2d 164. See also Alliance Ins. Co. v. City Realty Co., D.C., 52 F.2d 271, where the court reviewed the history of the development of the custom in the stock insurance business by which insurance companies conceded the expiration rights formerly owned by themselves to the independent agents who represent them.

The expiration rights of an agent are of great value. Ownership of these rights enables agents of advanced years or in poor health to sustain and support themselves solely through their renewal business. Upon an agent's death these rights become a part of his estate. It has been represented and is no doubt true that widows and sons of deceased agents are operating independent agen-

cies by virtue of their succession to the legally recognized property rights of a deceased husband or father. It would seem therefore that the agreement of Board members to represent stock insurance companies exclusively is dictated in part by the belief that stock insurance companies provide policyholders with a superior type of indemnity contract and also by legitimate considerations of self-interest based upon the apparently justifiable belief that representation of mutual companies would result in a loss or serious impairment of valuable property rights.

Unlike the Direct Writer Rule, the mutual rule exerts no coercion upon outsiders. It has no coercive effect upon mutual companies or their agents. It applies no economic pressure upon either mutual companies or agents for the purpose of compelling them to do or to refrain from doing anything. It contains no threat of economic reprisal for any course of action contemplated by mutual agents or companies. Such companies and agents are entirely free to compete with Board members and others and they do so in most instances with the competitive advantage of being able to offer mutual insurance to prospective buyers at a lower cost. They are free to solicit the clients of Board members. The renewal rights of Board members operate as no restraint upon the competitive endeavors of any one except the companies that issue the policies. That the operation of the rule has not resulted in harm to mutual agents is attested by the affidavits of two mutual agents, viz., Benjamin Sager, a former President of the national association of mutual agents, and Homer Harrison, a former President of the local mutual agents association. They asseverate that the action of the Board has not resulted in injury to their business. Nor does there appear to be any attempt to monopolize. The record discloses that mutual companies in Cuyahoga County obtain a share of the total insurance business that compares favorably with the percentage of business done by such companies nationally. The sole restraint imposed by the rule is upon those members of the Board who, except for the rule, might engage in the sale of mutual insurance. This is a minimal restraint. If a member decides he no longer wishes to sell stock insurance exclusively, he may resign his membership, accept representation of mutual companies, and continue to represent those stock companies which he represented as a Board member. Membership in the Board is not a prerequisite for representation of stock insurance companies. By withdrawing from the Board a member suffers no loss of business; nor is there any impairment of his competitive position; indeed, as the defendant aptly observes, in the event of resignation his position "in some ways may be improved."

Primarily, the function of the rule is to prescribe the qualifications for membership in the Board. The State of Ohio has granted the Board a corporate charter authorizing it, among other things, to preserve the stock principle in the insurance business and to develop and foster the American agency system. No claim is made that these objectives are unlawful. Nor does the Government suggest that men engaged in the same business, dealing in an identical article of commerce, may not associate for the purpose of promoting their common interests. To best subserve its purposes the Board has limited membership in the Association to insurance agents who do business exclusively with stock companies operating under the American agency system. It would poorly serve the objectives of the Board to admit mutual agents as members. As representatives of corporations that issue no stock, such agents cannot be expected to accept the principles of the Board or to assist in their furtherance. Nor can agents who represent both stock and mutual companies be expected to accept completely the Board's philosophy of doing business. In the light of these considerations, the rule which restricts membership to those agents who represent and continue to represent stock insurance companies exclu-

sively, does not seem unreasonable. As shown above, members may resign without suffering any detriment to their competitive position. A rule of a trade association that invokes no economic sanction for its violation, cannot be said to unduly interfere with the free choice of agents to retain or relinquish their membership.

The rule is also an agreement among the members not to compete with one another by selling mutual insurance, or, as otherwise stated, it is an agreement of the members not to represent mutual companies. It is this concerted refusal to deal with mutual companies that the Government claims constitutes an unreasonable restraint of trade.

■ As I read the cases, a concerted refusal to deal is illegal if it actually does or probably will result in harm to individuals or to the public. As succinctly stated in Eastern States Lumber, supra [234 U.S. 600, 34 S.Ct. 955], a concerted refusal to deal " 'may be prohibited or punished, *if the result be hurtful to the public or to the individual against whom the concerted action is directed.'* " (Emphasis supplied.)

In support of its claim that the concerted refusal of Board members to represent mutual companies is an unreasonable restraint of trade, the Government relies almost entirely upon its contention that all concerted refusals to deal are illegal *per se.* For the reasons stated supra (144 F.Supp. at pages 696 to 698 inclusive) I am of the opinion that the principle for which the Government contends has no application here.

■ In addition, the Government argues that "The agreement of the Board members, who are in a preferred position with respect to the great bulk of the insurance business in Cuyahoga County, interferes with the access of mutual companies to the business represented by Board members." The logic of this argument is difficult to comprehend. The market for insurance is composed of those members of the public who are potential buyers of insurance and those who have policies that will be renewed. The rule of

the Board does not foreclose the competition of mutual companies from any portion of the market. It interferes in no way with the free and unrestricted opportunity of mutual companies, acting through their own employees and agents and through non-Board stock agents, to solicit business from all potential buyers of insurance and all policyholders, including customers of Board members. It is true that Board members enjoy a preferential position in respect of a large portion of the insurance business in Cuyahoga County. This is due to many factors, not the least of which is the greater number of stock companies and stock company agents doing business in Cuyahoga County. It is due in substantial part also to the agents' ownership of their expiration rights. It may be difficult for competitors to wrest this business from the Board agents. But the fact that such competition is difficult does not mean necessarily that the successful Board agents have attained their "preferred position" by illegal means. As was said in Federal Trade Commission v. Curtis, 260 U.S. 568, 582, 43 S.Ct. 210, 213, 67 L.Ed. 408:

> "Effective competition requires that traders have large freedom of action when conducting their own affairs. Success alone does not show reprehensible methods, although it may increase or render insuperable the difficulties which rivals must face."

■ It is probable that a substantial proportion of mutual companies are not interested in the Government's attack on the rule. It is alleged in the Complaint and admitted in the Answer that "a majority of all mutual companies in Cuyahoga County deal through branch offices, although some utilize the services of agents." These companies, like direct-writing stock insurance companies, prefer to do business directly with the public through their own employees rather than through independent agents. Few, if any, of such companies appoint independent agents. Those mutual companies which refuse to appoint any independent agents are in no way affected

by the refusal of independent stock agents to deal with them. It is seriously to be doubted also that mutual companies which "utilize the services of agents" have any real interest in obtaining Board agents to represent them. Mutual companies know they cannot expect effective sales efforts in their behalf from agents who are wedded to stock companies and who stand to lose valuable property rights by selling mutual insurance. Like other sales organizations, mutual companies necessarily must rely upon the efforts of their own loyal representatives who are convinced of the advantages of mutual insurance and who can present its merits to prospective customers with sincerity and enthusiasm. It is a matter of common knowledge that entrance into the insurance business requires little or no capital investment and no special training or skill. Newcomers are constantly entering the field. This affords mutual companies frequent and numerous opportunities to increase the number of their outlets. Available to mutual companies also are the vast and varied agencies of advertising and communication through which they may acquaint the public with the merits of their indemnity contracts. There is nothing in the record to indicate that mutual companies have been adversely affected by the rule. On the contrary, such evidence as there is on the subject tends to show that mutual companies and mutual agents do a prosperous and profitable business in Cuyahoga County. Benjamin Sager, one of the two affiants above referred to, states: "Mutual fire insurance agents and mutual fire insurance companies have grown and flourished under the competitive climate which existed at the time of the filing of the above captioned action." In addition and in relation to the exchange of surplus business, Sager said: "Mutual agents experience no difficulty in brokering their surplus or excess good business with other agents or other companies." In this connection, affiant Homer Harrison states: "In my experience over these many years I have never experienced any inability to write as much

coverage on acceptable business as would be required." While these statements are untested by cross-examination, they are the sworn testimony of experienced and responsible men, and being uncontroverted, must be accorded substantial weight.

■ Under the evidence in the record it cannot be held as a matter of law that the competition of mutual companies has been substantially lessened by the Board rule or that mutual companies or their agents have suffered economic injury by virtue of its operation. Nor has the Government submitted evidence tending to show that the rule has affected the price structure of the insurance business in Cuyahoga County or otherwise detrimentally affected the public interest. While the Board's evidence is sufficient to repel the Government's attack, it does not meet the standard of proof required to sustain the Board's motion for summary judgment. The Board's proof does not compel the inference that no harm has resulted or probably will not result to mutual companies or to the public. In view of the paucity of relevant evidence, it cannot be held as a matter of law that the operation of the rule does not adversely affect the paramount public interest.

Although both parties have filed motions for summary judgment, it appears that there are genuine disputes of fact as to the effect of the rule on mutual companies and the public. These are disputes which can be resolved only upon a consideration of all relevant data in a hearing on the merits. Furthermore, the issues here presented are of such importance as to require the presentation and consideration of all available relevant evidence. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236.

The motions for summary judgment of both parties are overruled. A decree may be prepared in accordance with the foregoing.