UNITED STATES of America, Plaintiff,

v.

NEW ORLEANS INSURANCE EX-CHANGE, Defendant.

Civ. A. No. 4292.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 5, 1957.

M. Hepburn Many, New Orleans, La., Edward R. Kenney, William H. Rowan, Charles F. B. McAleer, Washington, D. C., for plaintiff.

Henican, James & Cleveland, Philip E. James, Murray F. Cleveland, New Orleans, La., Carlos G. Spaht, Byron R. Kantrow, Baton Rouge, La., for defendant.

J. Skelly WRIGHT, District Judge.

The New Orleans Insurance Exchange, a private association of 130 insurance agencies [1] which control approximately three-fourths [2] of the fire, casualty and surety [3] insurance business in the New Orleans area,[4] is charged in these proceedings with violations of Sections 1 and 2 of the Sherman Act.[5] Spe-

1. These independent agencies are part of what is called the American agency system, that is, they solicit insurance from the public and place it, at their election, with one or more of several companies represented by them. The agencies own what are called "expirations" on the policies handled by them. Expirations are the property right which inheres in having sold the existing policy and in knowing when it will expire, so that a renewal may be obtained. It is generally recognized in the trade that one who owns the expirations, generally speaking, controls renewals.

2. The Exchange occupies a dominant position in the fire, casualty and surety insurance market in the New Orleans area. During the period 1951 through 1954, member agents wrote: (1) 65.1% of all multiple lines of insurance written by fire and casualty companies in the New Orleans area; (2) 71.6% of all lines of insurance written in the New Orleans area under the jurisdiction of the Exchange; (3) 81.3% of fire insurance written in the New Orleans area; (4) 67.4% of casualty insurance (excluding accident and health) in the New Orleans area; and (5) 98.1% of surety insurance in the New Orleans area. In addition, member agents represent over 90% of the stock fire and casualty companies in the United States which possess assets in excess of $50,000,000. The dollar volume of business written by Exchange members is substantial, amounting to approximately $25,000,000 to $30,000,000 in premiums annually.

3. The complaint does not specifically cover contracts of surety although such contracts may be included in the term casualty insurance. In any event, no objection was made to the evidence concerning surety agreements when it was first offered and no prejudice is shown by the admission thereof. Rule 15(b), Fed.R. Civ.P., 28 U.S.C.A.

4. This area is composed of Orleans, Jefferson and St. Bernard Parishes.

5. The relevant sections of the Sherman Act, Act of July 2, 1890, c. 647, 26 Stat. 209, as amended, provide in part as follows:
"Sec. 1. [26 Stat. 209, 50 Stat. 693, 15 U.S.C.A. § 1] Every contract, combination in the form of trust or other-

cifically, the complaint charges that the Exchange and its members are engaging in an unlawful combination and conspiracy to restrain interstate commerce in insurance and to acquire a monopoly in its area of operations by maintaining a group boycott against all nonmember insurance agencies as well as against all insurance companies which do not plant exclusively through Exchange outlets or members.

The defendant admits the boycott but denies that it unreasonably restrains trade or tends toward monopoly. It also denies that its members are engaged in interstate commerce. It asserts further that the McCarran Act [6] excludes the business of insurance from the operation of the federal antitrust laws.

The group boycott is effected through a series of bylaws of the Exchange by which members thereof agree to boycott any stock company which plants through any except Exchange agents in the New Orleans area,[7] to boycott any stock company which sells directly to the public,[8] to boycott mutual companies irrespective of how or by whom the insurance is sold,[9] and to boycott nonmember agencies so that the facilities of companies planting exclusively through Exchange outlets are denied such agents.[10] These

wise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *

"Sec. 2. [26 Stat. 209, 15 U.S.C.A. § 2] Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *

"Sec. 4. [26 Stat. 209, 15 U.S.C.A. § 4] The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. * * * *"

6. 15 U.S.C.A. § 1013(a) and (b).

7. The bylaws read as follows:
Article X, Section 1:
"Active Members shall not accept or retain the agency of any company, including Underwriters of same, which has or whose General Agent or Manager has agents within the jurisdiction of this Exchange who are not Active Members of the Exchange."
Article X, Section 2:
"Active Members shall not accept or retain the agency of any insurance company, including its parent corporation, all underwriting agencies of such company, members of a group or fleet of companies, and all companies owned, either in whole or in part, managed, controlled, directly or indirectly, or reinsured by such company, unless all agents within the jurisdiction of this Exchange, of such insur-

ance companies, are members of this Exchange."

8. The bylaw reads as follows:
Article X, Section 3:
"Active or Associate Members of this Exchange may not represent or place business with a company, not a member of this Exchange, whose State Agent, Special Agent, Manager or salaried representative solicits from or issues policies or bonds direct to the public within the jurisdiction of this Exchange or accepts such business from a non-member of this Exchange."

9. The bylaw reads as follows:
Article IX, Section 6:
"It shall not be permissible for Members to place business within the jurisdiction of the Exchange with non-member agents or with any type of non-stock carriers unless and until the facilities of all members of the Exchange have been exhausted and an affidavit to that effect has been filed with the Secretary of the Exchange within ten days of the binding of the risk."

10. The bylaws read as follows:
Article IX, Section 6 (see Note 9)
Article IX, Section 7:
"It is permissible for Active Members to accept business from Non-Member Agents and Brokers domiciled in the territorial jurisdiction of the Exchange, provided no commission or other valuable consideration is paid directly or indirectly on such business; and, provided further, that the member immediately notify the Secretary of the Exchange in writing, giving the name of the Non-Member, character and location of the risk, amount of insurance and premiums, and further pays to the Exchange, promptly, an amount equal to 10% of the

bylaws are rigidly enforced. All members are under obligation to police other members and to report violations. A member charged must make a full disclosure by presenting his books and records for examination by the Exchange, and any member found guilty of violation of bylaws is substantially fined or expelled from the Association. When a member is expelled from the Exchange, he is stripped of his representation of Exchange controlled companies and is thus required to operate outside the Exchange subject to the group boycott provided in the bylaws.

The effect of the boycott, as shown by the evidence, is that practically all the major stock companies plant exclusively through Exchange outlets and deny their facilities to non-Exchange members, in spite of the fact that in other areas uncontrolled by similar boycott, the same insurance companies plant through agents representing all types of insurance companies, including mutuals. In fact, some of the stock companies whose method of operation is controlled by the boycott of the defendant Exchange sell directly to the public in uncontrolled areas. Moreover, by being denied the facilities of the large stock companies controlled by the Exchange, nonmember agents operating in the area are relegated to handling risks which do not require the capacity of the controlled companies. Insurance companies such as mutuals and direct writers, who are not allowed to plant through Exchange outlets, are subjected to the group boycott and are thus excluded from the substantial market controlled by the Exchange. An addi-

tional effect of the group boycott is that part of the public which has placed its confidence concerning insurance matters with members of the Exchange is denied access to low cost insurance.

The Government insists, with much support from the authorities, that the bylaws of the Exchange, rigorously enforced as they are, constitute a per se violation of the Sherman Act. In fact, this case is remarkably close in many of its aspects to Fashion Originators' Guild of America, Inc., v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949, where the Court held that evidence on the question of reasonableness of the boycott there in suit was immaterial, that, without more, the purpose and object of the unlawful combination, its tendency toward monopoly and the coercion practiced upon a rival method of competition brought it within the prohibition of the Sherman Act.

In the Fashion Guild case, the defendants were designers, manufacturers and distributors of women's clothes. In order to control what they considered to be piracy of their clothing designs, the members of the Guild devised a plan whereby they refused to sell to retailers who purchased and sold garments which were unauthorized copies of designs of Guild members. The Supreme Court held that the combination was "well within the inhibition of the policies declared by the Sherman Act itself." [11] The language used by the Court in denouncing the vices of the Guild's scheme is so pertinent here that it bears repeating.[12] The Supreme Court has also indicated in International Salt Co., Inc., v.

net premiums involved, which said amount so paid, shall go towards the cost of keeping a record of such transactions."

11. Fashion Originators' Guild of America, Inc., v. Federal Trade Commission, supra, 312 U.S. at page 465, 61 S.Ct. at page 706.

12. In Fashion Originators' Guild v. Federal Trade Commission, supra, 312 U.S. at pages 465 and 466, 61 S.Ct. at page 707, the Court said:
"And among the many respects in which the Guild's plan runs contrary to the poli-

cy of the Sherman Act are these: it narrows the outlets to which garment and textile manufacturers can sell and the sources from which retailers can buy (Montague & Co. v. Lowry, 193 U.S. 38, 45, 24 S.Ct. 307, 308, 48 L.Ed. 603; Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 48–49, 33 S.Ct. 9, 15, 57 L.Ed. 107); subjects all retailers and manufacturers who decline to comply with the Guild's program to an organized boycott (Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 609–611, 34 S.Ct. 951, 953, 954, 58

United States,[13] 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, and United States v. Columbia Steel Co.,[14] 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533, that group boycotts are unreasonable per se and "clearly run afoul of § 1"[15] of the Sherman Act.

But it is not necessary to decide this case on a per se basis. The rule of reason[16] dictates that this illegal combination must be destroyed. As shown above, the group boycott in suit not only had the potential unreasonably to coerce, restrain and control interstate commerce in insurance in the New Orleans area but it actually did. In fact, this defendant, through the dominant position of its membership, sits astride the stream of interstate commerce in insurance in the New Orleans area and directs its flow. It allows the large stock companies access to its outlets on condition that those companies participate in its group boycott of nonmember agencies. It refuses to allow any part of the 75 per cent of the insurance which it controls to move in the direction of mutuals or direct writers, and it relegates the numerically superior nonmember agencies to the discriminatory position of scrambling for the remaining 25 per cent of the business while excluding them from placing it with the major stock companies controlled by the Exchange. Such unreasonable restraints are calculated to affect adversely the persons subjected to the discrimination, and this record confirms the calculation.

In short, the Exchange practices are essentially the same, in purpose and effect, as those denounced as violative of the Sherman Act in Fashion Guild, supra. And here the evidence demonstrates that these practices not only tended to but actually did impose unreasonable restraints on interstate commerce. The Exchange's group boycott narrows the outlets or agents through which insurance companies can sell and the sources or companies through which agents can place insurance; it takes away the freedom of action of its own members by requiring them to partici-

L.Ed. 1490); takes away the freedom of action of members by requiring each to reveal to the Guild the intimate details of their individual affairs (United States v. American Linseed Oil Co., 262 U.S. 371, 389, 43 S.Ct. 607, 611, 67 L.Ed. 1035); and has both as its necessary tendency and as its purpose and effect the direct suppression of competition from the sale of unregistered textiles and copied designs (United States v. American Linseed Oil Co., supra, 262 U.S. at [page] 389, 43 S.Ct. [at page] 611, 67 L.Ed. 1035). In addition to all this, the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus 'trenches upon the power of the national legislature and violates the statute.' Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 242, 20 S.Ct. 96, 107, 44 L.Ed. 136."

13. In International Salt Co. v. United States, supra, 332 U.S. at page 396, 68 S.Ct. at page 15, the Court said: "Not only is price-fixing unreasonable, per se [citing cases], but also it is unreasonable, per se, to foreclose competitors from any substantial market. Fash-

ion Originators Guild of America v. Federal Trade Commission, 2 Cir., 114 F.2d 80, affirmed, 312 U.S. 457, 668; 61 S.Ct. 703, 85 L.Ed. 949."

14. In United States v. Columbia Steel Co., supra, 334 U.S. at pages 522, 523, 68 S. Ct. at page 1121, the Court said: "A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal per se. For example, where a complaint charges that the defendants have engaged in price fixing, or have concertedly refused to deal with non-members of an association, or have licensed a patented device on condition that unpatented materials be employed in conjunction with the patented device, then the amount of commerce involved is immaterial because such restraints are illegal per se. * * *"

15. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 625, 73 S. Ct. 872, 889, 97 L.Ed. 1277.

16. See Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619.

pate in the boycott and to reveal to the Exchange the intimate details of their individual affairs to insure that they do; it suppresses competition from mutual and direct writer insurance companies as well as competition from nonmember agencies generally; and in addition to all this, the Exchange is in reality a private super-governmental agency which prescribes rules for the regulation and restraint of interstate commerce, provides extra-judicial tribunals for determination and punishment of violations, and thus trenches beyond the power of the national and state [17] legislatures, in addition to violating the Sherman Act.

▇ Group boycotts and concerted refusals to deal flout the Sherman Act's command that competition rule the market place. Our economic faith is predicated on free competition uninhibited by group boycotts or other predatory practices. Not only must merchandise stand the cold test of competition, but services performed in connection with the sale thereof must be submitted to the same test, so that, in the last analysis, the public may have a free choice in spending its money, and businesses, willing and able to compete for that money, may have a free opportunity to do so. Therefore, any group boycott or concerted refusal to deal, if in fact not a per se violation of the Sherman Act, must, at the very least, be viewed with dark suspicion because of the commercial restraints and tendency toward monopoly inherent in such combinations. Where, as here, it is shown that the group boycott imposes unreasonable restraints on interstate commerce in violation of Section 1 of the Sherman Act, a Section 2 violation is just a short step away, for most, if not all, unreasonable restraints have as their purpose the acquisition of at least a greater share of commerce than could otherwise be obtained in a free economy. Combinations indulging in group boycotts, then, must be put to proof to clear themselves of the preda-

tory intent required for violation of Section 2 of the Act. Standard Oil Company of New Jersey v. United States, supra, 221 U.S. at page 75, 31 S.Ct. at page 520. Here such proof is wholly lacking. On the contrary, this record depicts a nascent, if not an accomplished, monopoly, nurtured by group boycott.

The Exchange makes the contention that its group boycott of nonmembers and uncooperative insurers does not deny them the right to approach the public and sell insurance outside the Exchange. That is true. But it is the agency who controls the insurance buyer and the placement of his insurance. Admittedly, the Exchange agencies control approximately 75 per cent of the concerned insurance purchased in the New Orleans area. That insurance is placed with companies chosen by the agencies and not by the assureds. Consequently, any company who is allowed to plant through Exchange agencies, even on an exclusive basis, is happy to accept the "invitation" since otherwise it would be denied access to three-fourths of the insurance business in the area. And the minute a company submits to Exchange coercion and control, nonmember agencies are denied access to that company for the placement of risks.

The result, therefore, is that not only are the mutuals and other companies operating outside the Exchange excluded from a substantial market by a group boycott effected through the use of the dominant position of the Exchange, but companies allowed to do business through the Exchange outlets are actually controlled in their method of doing business in that, in addition to being denied the right to deal directly with the public, they must participate in the Exchange boycott of nonmember agencies. Not only are nonmember agencies restricted in their operations by a group boycott effected through the use of the dominant position of the Exchange, but the memmer agencies themselves are prisoners, sometimes unwilling prisoners, of their

---

17. Louisiana has a comprehensive insurance code providing for the complete regulation of the insurance industry within the state. LSA–R.S. 22:1–22:1734.

own rules, for they, too, are limited in their operations under pain of expulsion and boycott. It must be remembered that in suit here is a group boycott, participation in which is required of every Exchange member by its bylaws. While an individual agency may have the right to boycott another agency or an insurance company,[18] a concerted refusal to deal brings the combination within the condemnation of the Sherman Act. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; American Medical Association v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed 145; Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490.

The Exchange also states that its reason for boycotting mutual insurance companies is that the mutuals are socialistic in character whereas its membership is dedicated to the American way of life. That argument sounds high and lofty but the truth is that not only are mutuals boycotted under the requirements of the bylaws, but any company, stock, mutual or otherwise, which does not plant exclusively with Exchange members is likewise discriminated against. Thus the touchstone for acceptance by the Exchange is not belief or disbelief in socialism but willingness to submit to the restraints imposed by the Exchange.

■ The Exchange also argues that the reason for the restrictive bylaws is to protect the American agency system. But good intent is no defense under Section 1 of the Act except in non per se violations where unreasonable restraints are not shown. United States v. Colum-

bia Steel Co., supra, 334 U.S. at page 522, 68 S.Ct. at page 1121. Where, as here, unreasonable restraints are shown, the requisite intent is inferred from the unlawful effects. Times-Picayune Publishing Co. v. United States, supra, 345 U.S. at page 614, 73 S.Ct. at page 883; United States v. Griffith, 334 U.S. 100, 105, 108, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333.

The asseverations of good intent are also subject to considerable question. The evidence shows that mutual companies who are not direct writers also use the American agency system. In fact, all of the government's witnesses are mutual agents who are a part of the American agency system. Moreover, until 1950 there was an Exchange bylaw which applied the boycott against participating stock companies[19] using the American agency system, irrespective of their willingness to submit to Exchange control. Although the bylaw was repealed in 1950, the evidence shows that the boycott continues. It would seem, therefore, that the reason for the boycott of mutual as well as participating stock companies, as shown by the minutes of the meeting of the Exchange at which the boycott against participating stock companies was adopted, is, not the protection of the American agency system, but the prevention of a possible reduction in agency commissions caused by reduction in cost of insurance to the public.

■■ The defenses of the Exchange regarding interstate commerce and the McCarran Act may be quickly disposed of. In United States v. Southeastern Underwriters Association, 322 U.S. 533,

18. Compare Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L. Ed. 162; United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992.

19. A participating stock company is like a mutual insurance company in that the policyholders participate in the profits of the company by receiving dividends, thereby reducing the net cost of the insurance.

64 S.Ct. 1162, 88 L.Ed. 1440, the Court held that the business of insurance, when conducted across state lines,[20] is interstate commerce. And even where, as here, the challenged activity is at the local level, "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Manufacturers Association, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805; United States v. Employing Plasterers' Association of Chicago, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed 618.

■ It is true that Section 3(a) [21] of the McCarran Act provides that the Sherman Act "shall not apply to the business of insurance or to acts in the conduct thereof." But Section 3(b) [22] of the same act provides: "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." The legislative history of Section 3(b) affirms what its language so plainly says.[23] United States v. Insurance Board of Cleveland, D.C., 144 F. Supp. 684.

Decree for plaintiff in accord with Findings of Fact and Conclusions of Law this day rendered.

**20.** The record shows that 90% of the insurance companies concerned here are domiciled in states other than Louisiana. In United States v. South Eastern Underwriters Association, supra, 322 U.S. at page 537, 64 S.Ct. at page 1165, the Court said:
"(T)he insurance business * * * include(s) not only the execution of insurance contracts but also negotiations and events prior to execution of the contracts and the innumerable transactions necessary to performance of the contracts. All of these alleged transactions * * * constituted a single continuous chain of events, many of which, * * * could possibly have been continued but for that part of them which moved back and forth across state lines."

**21.** 15 U.S.C.A. § 1013(a).

**22.** 15 U.S.C.A. § 1013(b).

**23.** 91 Cong.Rec. 1486, Feb. 27, 1945. The Senate Judiciary Report on the bill reads: "Section 4 (Section 3 of the final enactment) suspends the application of the Sherman Act [15 U.S.C.A. §§ 1–7] and the Clayton Act [15 U.S.C.A. § 12 et seq., 18 U.S.C.A. § 660, 29 U.S.C.A. §§ 52, 53] to the business of insurance until January 1, 1948; and (b) provides that at no time are the prohibitions in the Sherman Act against any act of boycott, coercion, or intimidation suspended. These provisions of the Sherman Act remain in full force and effect."