**UNITED STATES of America,**
Plaintiff,

v.

**INSURANCE BOARD OF CLEVELAND,**
Defendant.

**Civ. No. 28042.**

United States District Court
N. D. Ohio, E. D.

Oct. 7, 1960.

Robert B. Hummel, Chief Great Lakes Field Office Antitrust Division, Dept. of Justice, Norman Seidler, Dwight B. Moore, Cleveland, Ohio, for United States.

Frank X. Cull, Michael R. Gallagher, Cleveland, Ohio, for defendant.

McNAMEE, Chief Judge.

In its Complaint the Government alleged that in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, the defendant Board conspired with its trustees, officers and members to restrain and monopolize commerce in the business of selling and writing fire insurance in Cuyahoga County, Ohio. It was the Government's position that the conspiracy was evidenced by the operation and enforcement of six rules of the Board known as: (1) the In-or-Out rule; (2) the Reciprocity or Non-intercourse rule; (3) the Non-deviation rule; (4) the Direct Writer rule; (5) the rule relating to Policy writing and Recording Services by insurance companies, and (6) the Mutual rule. By virtue of the enactment of multiple line legislation during the pendency of the action the jurisdiction of the Board was extended to include casualty as well as fire insurance. Both parties filed Motions for Summary Judgment. In ruling on the Motions, this Court held that the issues involving the legality of the In-or-Out rule and the Reciprocity Rule were moot. Under the authority of United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, the claim of the Government as to the illegality of the Non-deviation rule was dismissed without prejudice. The Direct Writer rule was held invalid and the Government's Motion for Summary Judgment as to such rule was granted. The Motions for Summary Judgment of both parties were overruled as to the rule relating to Policy Writing and Recording services and the Mutual rule. Jurisdiction was retained for a determination on the merits of the legality of both rules. See 144 F.Supp. 684, 707. The Government has now indicated it does not desire to press its claim on the Policy writing and Recording service rule. Thus there remains for determination in this proceeding the sole question whether the Mutual rule of the Board constitutes a violation of the Sherman Act.

Issues.

At the hearing on the Motions for Summary Judgment it was the Government's contention that the Mutual rule constituted an agreement to boycott and as such was illegal per se. The defendant conceded that in effect the rule was a concerted refusal to deal but argued that the rule of reason ought to be applied to determine whether the Mutual rule imposed an unreasonable restraint of trade. 144 F.Supp. 696. For the reasons stated in its earlier memorandum, this Court held the rule of reason as declared in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, should be applied to determine whether the rule under attack was illegal. 144 F.Supp. 698. At the hearing on the Motions the defendant sought to justify the Mutual rule on the ground, inter alia, that few, if any, mutual companies protected the expiration rights of independent agents. It was shown at the trial, however, that a substantial number of mutual companies deal exclusively through independent agencies whose expiration rights are protected by contract. In the light of such evidence the defendant has abandoned the above ground of justification. At the former hearing the defendant also advanced the argument, then unchallenged by the Government, that some mutual policies designated as non-assessable might in certain circumstances be held to be assessable. The Government now takes issue with the defendant's contention in this regard. In the only reported case in which the question arose, Moreland v. Knox, 268 S.W.2d

744, the Texas Court of Appeals, reversing the lower court, held that holders of non-assessable policies had the right to rely upon their contract of insurance and could not be assessed when the issuing company was in liquidation. This question has never been decided in Ohio nor has any competent administrative authority of the State expressed an opinion on the subject. As suggested by defendant, it is possible that an Ohio court might not agree with the Texas Court of Appeals, and find the reasoning of the lower court in Moreland v. Knox, supra, more persuasive. The possibility thus envisioned by defendant cannot be ruled out entirely, but it would be inappropriate for this Court to hazard a guess on the probable attitude of the Ohio courts when and if the question is presented to them for adjudication. However, the decision in the only reported case dealing with the question supra is adverse to defendant's contention, and weakens the force of defendant's argument in justification of the Mutual rule. The defendant, however, no longer concedes that the Mutual rule is a concerted refusal to deal. Defendant now takes the position that before joining the Board each member made an individual determination to sell stock insurance exclusively and that the aggregate of such individual determinations as represented by the Board membership does not constitute a combined or concerted refusal to deal with Mutual companies. The Board concedes that it takes concerted action in relation to its educational courses, its action on legislative matters and in rendering assistance to the Department of Insurance of the State of Ohio. The Board contends, however, that no concerted action is directed against Mutual companies. The Government adheres to its original position that the Mutual rule is a concerted refusal to deal, and as such is illegal per se. In support of its position the Government relies upon Klor's Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 and United States v. New Orleans Ins. Exchange, D. C., 148 F.Supp. 915, affirmed per curiam 1957, 355 U.S. 22, 78 S.Ct. 96,

2 L.Ed.2d 66. The defendant argues that neither of the above authorities is applicable here. The cited cases will be discussed later in this opinion. Thus the issues are: (1) Is the Mutual rule illegal per se as a concerted refusal to deal with or a boycott against mutual companies? (2) If the Mutual rule is not illegal per se, do the facts show that the purpose or effect of the Rule is to impose an unreasonable restraint of trade in interstate commerce?

### Facts.

The Board is a non-profit corporation organized under the laws of Ohio. Established in 1846, it is undoubtedly the oldest trade organization in Cuyahoga County. Its membership consists exclusively of independent fire and casualty insurance agents doing business in Cuyahoga County who operate under the American Agency System and represent only insurance companies organized under the stock ownership plan. Since its organization the Board has been dedicated to the policy of representation of stock insurance companies exclusively. Its present Amended Articles of Incorporation reaffirm the Board's historic purpose to foster and preserve the stock ownership principle and the American Agency System. In addition to the effectuation of such purposes, the Board engages in many other activities. It has been its consistent policy to promote and elevate the professional standards of its members and insurance agents generally. It conducts educational classes in insurance available to Board and Non-Board members alike. It has a program of assisting the State Superintendent of Insurance in the enforcement of relevant statutes and collaborates with the State Board of Fire Insurance Agents in advocating and opposing legislation affecting the insurance business.

Control of the business secured by an independent agent resides largely with the agent who usually represents more than one insurance company. Personal contact with the policyholder is confined to the agent. The agent sustains a fiduciary relation to his client and selects the

company that writes the policy. Insurance companies delegate to such agents wide discretionary powers which may involve substantial financial risk to the company and the agent is protected by contract in his expiration rights. There is no doubt that as between the insurance company issuing the policy and an independent agent, the latter controls the business. Agency insurance companies "are almost entirely dependent upon the agents for the volume and quality of their business." 144 F.Supp. 688. The members of the Board control a significant portion of the insurance business in Cuyahoga County, Ohio. The rule here under attack provides that members:

"Agree to have and maintain the following qualifications for membership, namely: * * *

"(c) represent and continue to represent as agents only capital stock insurance companies * * *" (Article 111, Sections 4c, 5c and 6c)

▬ The primary function of the rule is to prescribe qualifications for membership in the Board. Those qualifications are in harmony with the fundamental purposes of the Board as specified in its Articles of Incorporation. The distinction between stock and mutual companies is well known. A stock company has for its basis capital stock owned by its shareholders who constitute the corporation and may be distinct from its policyholders. Its divisible profits are distributed in the form of dividends to its shareholders. In strictly mutual companies there are no stockholders; the policyholders are members of the corporation, entitled to manage its affairs through their agents and officers and to receive by way of dividends or premium allowances a share of the divisible surplus. As the owner of a company in which he is insured, a mutual policyholder is subject to contingent liability if the policy so provides and there exists the doubtful possibility that in certain circumstances a mutual policy designated as non-assessable may be held to be assessable. Mutual companies themselves have recognized the distinction between the two classes of insurance and have formed trade associations, alliances and pools upon a mutual basis. Field agents have formed associations along stock or mutual lines exclusively. Congress has recognized the fundamental distinction and has provided for different income tax treatment for the two classes of insurance companies. Companies writing these classes of insurance are organized under different sections of the Revised Code of Ohio. Since the abandonment of the In-and-Out rule [1] in April 1953, a member of the Board who decides he does

---

1. Marginal Note
The In-or-Out Rule declares ineligible to membership those who are agents of or transact business with fire insurance companies or any one of a group of companies under the same underwriting management or control which "* * * in transacting such insurance business in Cuyahoga County does not have an agent who is a member of this corporation or has or appoints an agent who is not a member of this corporation."

Under the In-or-Out Rule Board members are required to confine their representation to those insurance companies who transact all their business in Cuyahoga County through members of the Board. The effect of the rule is to require an insurance company doing business in Cuyahoga County to elect whether to be represented by Board members exclusively or to deal solely through non-Board agents. If an insurance company desires to be represented by members of the Board, it must refrain from appointing any non-Board agents. The appointment of a single non-Board agent results in the denial of a company's right to deal through any agent who is a Board member. Similarly, an agent who represents a single non-Board company is ineligible for membership in the Board and is denied the right to represent any of the companies who deal exclusively through Board members. If an agent or company elects to conform to the rule, a subsequent deviation therefrom would have far-reaching consequences entailing the loss by companies of the representation of successful agents who are members of the Board, and the loss by Board members of the representation of large and financially sound insurance companies.

not desire to continue selling stock insurance exclusively may resign his membership, accept representation of Mutual companies and continue to represent those stock companies which he represented as a Board member. An independent agent who represents stock companies exclusively is free to join the Board or not as he chooses. If he becomes a member of the Board he may, with complete freedom of choice, decide to represent mutual companies and resign his membership. By withdrawing from the Board a member suffers no economic loss whatever and, in many respects, his competitive position is improved. There is no evidence disclosing that the Board exerts any pressure or coercion to prevent a member from exercising his judgment freely to resign his membership and represent mutual companies.

There are three classes of independent insurance agencies, viz. stock agencies, mutual agencies and mixed agencies, the latter being engaged in selling both stock and mutual insurance. 3288 active insurance agents do business in Cuyahoga County, Ohio. 775 are members of the Board. Of the remaining number, 263 are employee-agents of direct writing mutual companies, and 2250 are stock and mixed agencies who are not members of the Board. It was shown by the testimony of officers of 12 mutual companies that their respective companies were substantial, in good financial condition and that each operated under the American Agency System. Special field agents of such mutual companies gave testimony of their efforts to persuade members of the Board to represent mutual companies. They testified that in nine instances their efforts met with failure. On the other hand, there was evidence of members of the Board resigning their membership to accept mutual representation and of other members retaining their membership, with the permission of the Board, while representing mutual companies. In the last mentioned cases Board agents had accepted mutual representation on a trial basis and were permitted to retain membership in the Board pending a final determination whether to accept mutual representation permanently. Some of these agents eventually relinquished their membership and assumed representation of mutual companies while others decided not to represent mutual companies and retained their membership in the Board. That these agents were restrained from promptly accepting or rejecting mutual representation by a desire to retain Board membership seems evident. But it is apparent also that the ultimate choice made by such agents was uninhibited by any coercion or fear of economic sanction. Field agents of mutual companies seeking new agencies also met with rejections from non-Board agents. It does not appear that the rejections from Board members were proportionately or numerically greater than the rejections of the various types of non-Board agents. A great variety of reasons were given by all agencies for their refusal to accept representation of mutual companies. Some Board agents who refused representation of mutual companies assigned their membership in the Board as the reason for such refusal, but indicated that if the Mutual rule were changed they would reconsider the matter. Other Board agents who gave the same reason for refusing mutual representation apparently were motivated by their preference for stock insurance. It was also shown that some Mutual companies, because of their erroneous belief that the rules of the Board were as stringent as they were prior to April 1953, engaged in no solicitation of Board members. In 1953, when the jurisdiction of the Board was enlarged to include Casualty insurance, 46 members were engaged in selling Mutual Casualty insurance. Some of these members resigned and continued to represent Mutual companies while others cancelled their contracts with Mutual companies and retained their memberships. Others sought and obtained permission of the Board to continue representing Mutual companies temporarily while retaining their memberships.

The record discloses that many independent agents sell both Stock and Mutu-

al insurance. It is claimed by the Government, and not denied by defendant, that such is the general rule in other parts of the State of Ohio and throughout the country. Representatives of the Mutual companies who testified stated that they desired representation in Cuyahoga County by agents who also sold Stock insurance. It was shown that most of the Agency Mutual companies did a substantial volume of business in Cuyahoga County and in recent years their premium volume in such county increased materially. In practically all such cases there were substantially higher proportionate increases in Cuyahoga County than in the other major counties of the State. It was not shown that Mutual agents, Stock agents or mixed agents were injured in any way by the operation of the Mutual rule. Nor was there any evidence of damage sustained by any Mutual company.

Members of the Board are in competition with one another in the sale of Stock insurance. There is competition between Board and non-Board agents, including both mixed and Mutual agents. The evidence does not show that Mutual insurance sold through independent agents costs less than stock insurance. The members of the Board gain no financial advantage in dealing exclusively in Stock insurance. It is their belief, however, that Stock insurance provides a superior form of indemnity. Further facts will be stated in the discussion of the issues.

### Discussion.

In overruling the Motions for Summary Judgment, this Court reviewed the cases cited in support of the dicta in United States v. Columbia Steel, 334 U.S. 495, 522–523, 68 S.Ct. 1107, 92 L.Ed. 1533, and Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L. Ed. 1277, upon which the Government relied, and reached the following conclusion:

> "Considered in the light of the cases upon which it rests, the dicta of the court may be considered fairly as asserting no more than that group refusals to deal of the kind exemplified by the cited cases and which exert coercion on outside parties are illegal per se." 144 F.Supp. 696–698.

This Court also expressed the opinion that the dicta in the above cited cases—

> * * * did not constitute "an unqualified condemnation of all group refusals to deal irrespective of their intent and effect and the means employed to accomplish the purposes of the combination." 144 F.Supp. 698.

Subsequent to the ruling on the Motion for Summary Judgment, the Supreme Court decided two antitrust cases in which the subject of per se illegality of group refusals to deal was discussed. Northern Pacific Ry. Co. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed. 2d 545; Klor's, Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741. In Northern Pacific the issue was the illegality of a tying clause and the Court, by way of dictum, included group boycotts within the category of practices considered to be illegal per se. In defining "this principle of per se unreasonableness," the Court said:

> "However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. * * *" [356 U.S. 1, 78 S.Ct. 518]

As the Government asserts, the above dictum foreshadowed the decision in Klor's, which involved a group refusal to deal. The issue in Klor's arose on defendant's Motion for Summary Judgment, and the following undisputed allegations appeared in the complaint: (1) Manufacturers and distributors of well-known brands of appliances conspired amongst themselves and with Broadway-Hale (the operator of a chain of department stores) not to sell to Klor's or to sell

at discriminatory prices and upon highly unfavorable terms; (2) Broadway-Hale used its monopolistic buying power to bring about this situation; (3) the concerted refusal to deal with Klor's has seriously handicapped its ability to compete and caused a great loss of profits, goodwill, etc. Thus it was readily apparent upon the admitted facts in the record that the concerted refusal to deal with Klor's had a "pernicious" or destructive effect upon competition and lacked any "redeeming virtue." In Klor's, coercive economic pressure was exerted both in the formation and continuance of the conspiracy and in the effectuation of its unlawful purpose. In contrast, the case at bar involves no conspiracy between suppliers of insurance and the Board or its members and the Government has not intimated that such a conspiracy exists. Here the evidence does not show that Mutual companies have sustained a loss of profits. On the contrary, Agency Mutual companies doing business in Cuyahoga County have prospered. There is no evidence that Board members derive any financial advantage from the operation of the Mutual Rule nor is there any evidence of coercion of Board members or Mutual companies. In view of these circumstances it cannot be determined without further inquiry whether the Mutual Rule results in an unreasonable restraint of trade. The Government contends that the absence of coercion is irrelevant. This argument must be rejected. Since Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, it has been settled that the Sherman Act prohibits only undue or unreasonable restraints of trade. In antitrust cases, therefore, the degree of restraint is always a critical factor. Coercive economic pressure affects the degree of restraint and is frequently, if not always, a distinguishing characteristic of concerted refusals to deal that are conclusively presumed to be unlawful. The presence or absence of such element, therefore, would seem clearly to be relevant to the issue whether the restraint of a concerted refusal to deal is unreasonable per se. The Government asserts that in Klor's the court found the basic evil of the boycott in that case to be the interference with the independent judgment of a competitor in a fair market. It is true that the Court found that the free judgment of the distributors and manufacturers to sell was restrained and that Klor's freedom to buy in a competitive market was restricted by the boycott. However, it is an inescapable inference that the restraint upon the free judgment of the distributors and manufacturers resulted from the coercion implicit in the monopolistic buying power of Broadway-Hale and that Klor's freedom to buy in accordance with its independent judgment was restricted by the coercive economic pressure of the combination. Furthermore, if the Mutual Rule imposed economic sanctions for its violation, the degree of restraint upon the members of the Board would be accentuated and it cannot be doubted that in such event the Government would contend that the coercive effect of such sanctions was relevant to the issue of per se illegality. In its essential ingredients, the Klor's case differs immaterially from those cases which were reviewed in the earlier memorandum of this Court in all of which there was present the common evil of coercive action against parties outside the group. I find no good reason, therefore, to recede from the position heretofore taken. Moreover, this case has now been tried on the merits and this presents a situation where the rule of reason "which is universal in its application," United States v. American Tobacco Co., 221 U.S. 106, 180, 31 S.Ct. 632, 648, 55 L.Ed. 663, ought to be applied to determine whether the membership rule under attack constitutes an unreasonable restraint of trade.

As above stated, in support of its contention that the Mutual Rule is not a concerted refusal to deal, the defendant contends that before entering the Board, each member made an individual determination to sell Stock insurance exclusively and that the aggregate of such independent decisions as represented by the membership of the Board does not con-

stitute a concerted refusal to deal with Mutual companies. This argument, takes no account of the fact that at the time he joins the Association and during the period of his membership therein, an agent becomes and remains united in purpose with the other members of the Association in a common plan to deal exclusively in Stock insurance. By their agreement to deal exclusively in Stock insurance, the members necessarily and implicitly agree not to sell Mutual insurance. By engaging in a course of conduct compatible with the Mutual Rule, the members of the Association participate in concerted action. "Concerted" means: "Mutually contrived or planned; agreed on;" (Webster's International Dictionary, 2nd Ed.) The effect of such concerted refusal to deal is to exclude agency Mutual companies from representation by independent agents who are members of the Board. It is the Government's position that the Rule operates to restrain members of the Board from accepting Mutual representation because of their desire to retain membership in the Board.

The Government's position is supported by the evidence. Some members resigned from the Board and accepted Mutual representation. However, other members who placed a higher value on their membership refused to act as agents for Mutual companies. Some of the members in the latter class indicated a willingness to reconsider their declinations if the rules of the Board were amended to permit members to represent Mutual companies without loss of membership. The desire to retain membership in the Board was effective also to cause some of the 46 members who were selling Mutual Casualty insurance in 1953 to cancel their contracts with Mutual companies when the Board enlarged its jurisdiction at that time to include Casualty insurance. At the same time other members obtained permission from the Board to retain their memberships while continuing the sale of Mutual insurance temporarily. Subsequent to 1953 still other members sought and obtained permission of the Board to sell Mutual insurance upon similar terms as to the retention of membership. It was shown that because of their belief that the rules of the Board were as stringent as they were prior to 1953, one or two of the larger Agency Mutual companies engaged in no solicitation of members of the Board. To what extent diligent solicitation by such companies would have resulted in additional acceptances of Mutual representation cannot be determined. But if, as implied by defendant, such solicitation would have added to the number of acceptances of Mutual representation, it is fair to assume that in such event there also would have been an increase in the number of rejections based either upon the desire of members to remain in the Board or upon their preference for Stock insurance, or both. That a large body of the membership of the Board regards insurance issued on the capital stock plan as the better class of indemnity is clear. The history of the Board is one of long and consistent adherence to the belief that the public interest is best served by selling only insurance issued on the capital stock plan. A substantial body of the membership subscribes wholeheartedly to that belief. It is a fair inference that this substantial group is satisfied with the Mutual Rule in its present form and will at all times adhere to their agreement to sell Stock insurance exclusively. It is for this body of the membership that the defendant speaks in urging the right of Board members to associate to foster and preserve the capital stock principle in the insurance business and to promote the other laudable objectives mentioned above. The right of businessmen to associate for the lawful purpose of promoting their economic beliefs is not open to question. If the law were otherwise, the continued existence of vast numbers of trade associations in this country would be in jeopardy. The State of Ohio expressly authorized the establishment of the defendant Association for the purposes set forth in its Articles of Incorporation which, in pertinent part, provides:

"Third. Said Corporation is formed to establish and maintain an association among residents of Ohio who are legally authorized as insurance agents or solicitors to transact the business of insurance on the capital stock plan in Ohio. The purposes of the Corporation shall be * * * to foster and preserve the capital stock principle in the insurance business; * * *"

In its Reply Brief the Government indicates it has no objection to an association of independent agents organized for the protection of their rights under the American Agency System and dedicated to fostering and preserving the capital stock principle in the insurance business provided that membership in such an association is not conditioned upon an agreement to sell stock insurance exclusively. Relying in part upon the policy of the National Association of Insurance Agents, the Government contends that an association of Stock Agents whose members are not disqualified, as such, if they also represent Mutual companies, can promote effectively the capital stock principle. The National Association is dedicated to the furtherance of the capital stock method of conducting the insurance business but requires as a condition of membership only that a member represent at least one capital stock insurance company. It is true that the defendant Board can best serve its purpose to foster and preserve the capital stock principle by limiting its membership to agents who agree to sell only Stock insurance. But a trade association is not privileged to promote its economic beliefs by the adoption of a plan that diminishes the opportunity of competitors of its members to compete in a free market. Such a plan transgresses the Sherman Act. As was said in Associated Press v. United States, 326 U.S. 1, 15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013:

"The Sherman Act was specifically intended to prohibit independent businesses from becoming 'associates' in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete. Victory of a member of such a combination over its business rivals achieved by such collective means cannot consistently with the Sherman Act or with practical, everyday knowledge be attributed to *individual* 'enterprise and sagacity'; such hampering of business rivals can only be attributed to that which really makes it possible—the collective power of an unlawful combination."

The members of the Board are independent businessmen who are associated in a common plan which, as shown by the evidence, is bound to reduce the opportunity of Agency Mutual companies to sell insurance in Cuyahoga County, Ohio. In the strict sense of the term, Board agents do not compete with Mutual companies. The latter compete with Stock insurance companies and, as already stated, neither the Board nor its members have conspired with such insurance companies. Nor has it been shown that the Board or its members gain any financial benefit by selling Stock insurance exclusively. While Mutual insurance sold by Direct Writers may cost the policyholders less than Stock insurance, the evidence does not show that Mutual insurance sold by independent agents is cheaper than Stock insurance sold by such agents. Nor has it been shown that Agency Mutual companies pay less commission than Agency Stock companies. However, the Mutual Rule of the Board operates to restrict the opportunity of Agency Mutual companies to sell a competitive type of insurance. The Rule narrows the outlets of Mutual companies and seems clearly to be within the principle announced in Associated Press, supra. Each member of the Board has the undoubted right individually to refuse to deal with Mutual companies but, as stated in Eastern States Retail Lumber Dealers Ass'n v. United States, 234 U.S. 600, 614, 34 S. Ct. 951, 955, 58 L.Ed. 1490:

"An act harmless when done by one may become a public wrong when done by many acting in con-

cert, for it then takes the form of a conspiracy, and may be prohibited or punished, if the result be hurtful to the public or to the individual against whom the concerted action is directed."

As indicated above, the business of Agency Mutual companies in Cuyahoga County has increased in recent years. This has been due in part to the greater number of agents representing such companies. The more than 2,000 Non-Board agents in the county provide a source from which additional agency representation may be secured by Mutual companies, thus further increasing the availability of Mutual insurance to the public.

■ It is the teaching of Klor's Inc. v. Broadway-Hale Stores, Inc., supra, however, that full opportunity of the public to buy competitive goods is no defense to a concerted refusal to deal. In Klor's the defendants submitted unchallenged affidavits showing that there were hundreds of other household appliance retailers, some within a few blocks of Klor's, who sold many competitive brands of appliances, including those the defendants refused to sell to Klor's. Reversing the decision of the Ninth Circuit Court of Appeals (255 F.2d 214, 233), which held that no public injury was shown, the Supreme Court held that concerted refusals to deal were in a class of restraints as to which "Congress had determined its own criteria of public harm and it was not for the courts to decide whether in an individual case injury had actually occurred." [359 U.S. 207, 79 S.Ct. 709.] It was also held in Klor's that group boycotts or concerted refusals to deal cannot be justified on the grounds of business necessity or self-protection. Moreover, the membership of the Board, numbering 775, includes some of the largest and most successful agencies in the county, and it is admitted by the defendant that—"the successful business operation of a fire (or casualty) insurance company in any locality where the company desires to operate through agents is directly related to its opportunity to secure the representation of the most profitable and best established agencies." The demonstrated effect of the Mutual Rule is to interfere with the competitive efforts of Agency Mutual companies to secure such representation. The Mutual Rule has the further effect of securing the members of the Board against competition between and among themselves in the sale of Mutual insurance. The members of the Board write a substantial amount of the insurance sold in Cuyahoga County through independent agents. The impact upon free competition of their concerted refusal to deal with Mutual companies cannot be regarded as insubstantial.

The Government cites United States v. New Orleans Insurance Exchange, D. C., 148 F.Supp. 915, affirmed 355 U.S. 22, 78 S.Ct. 96. In that case the issue of the legality of the Mutual Rule was considered in conjunction with the Non-intercourse rule and the drastic provisions of the In-or-Out rule. Present in that case also were coercive economic pressures and other practices similar to those condemned in Fashion Originators Guild of America v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. As the Government recognizes, the Exchange case is readily distinguishable. Following the Supreme Court's affirmance of that case, there was correspondence between counsel for the Exchange and District Judge Wright which the Government considered to be significant. By action of the District Judge the correspondence was made a part of the official record of the case. In counsel's letter it was stated that the Exchange proposed to discontinue the In-or-Out rule, the Non-intercourse rule and the practices constituting boycott, coercion or intimidation. The letter concluded with the following statement:

"On the other hand you agreed with us that there is no reason why a group of agents who believe in stock insurance and wish to sell only stock insurance can not continue to operate a trade association of this kind."

In his reply, Judge Wright said:

"You indicate that the Exchange intends to continue to operate as a group of agents who 'wish to sell only stock insurance.' This, of course, is a boycott of the Mutual insurance companies and is in violation of the decree."

While Judge Wright's post trial opinion is relevant, it is hardly entitled to receive the same weight as a judicial determination at the trial that, apart from the other rules in issue, the Mutual Rule of the Exchange was illegal.

The case at bar differs in many respects from the Supreme Court cases cited above and other cases heretofore decided by that Court involving concerted refusals to deal, but the effect of the Mutual Rule is to reduce the opportunity of Agency Mutual companies to sell insurance in the Cleveland market.

In the light of the controlling authorities, it must be held that the group refusal to deal, implicit in the Mutual Rule, constitutes an unreasonable restraint of trade—that it interferes with the natural flow of commerce and is injurious to the public. Associated Press v. United States; Eastern States Retail Lumber Dealers Ass'n v. United States; Klor's Inc. v. Broadway-Hale Stores, Inc., supra.

A decree may be prepared in accordance with the foregoing, which constitutes Findings of Fact and Conclusions of Law under Rule 52(a) Federal Rules Civil Procedure, 28 U.S.C.A.